Griffith H. Hayes
Nevada Bar No. 7374
Martin A. Muckleroy
Nevada Bar No. 9634
**COOKSEY, TOOLEN, GAGE, DUFFY & WOOG**
A Professional Corporation
3930 Howard Hughes Parkway, Suite 200
Las Vegas, Nevada 89169
Telephone: (702) 949-3100
Facsimile: (702) 949-3104

Seth D. Rigrodsky
Brian D. Long
Marc A. Rigrodsky
**RIGRODSKY & LONG, P.A.**
919 North Market Street, Suite 980
Wilmington, Delaware 19801
Telephone: (302) 295-5310
Facsimile: (302) 654-7530

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| SHAORONG LIAO, Derivatively On Behalf of Universal Travel Group, Inc., | Case No. |
| Plaintiff, | |
| v. | |
| JIANGPING JIANG, JING XIE, HUJIE GAO, LIZONG WANG, JIDUAN YUAN, LAWRENCE LEE, WENBIN AN, LIQUAN WANG, YIZHAO ZHANG, | **VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> <u>JURY TRIAL DEMANDED</u> |
| Defendants, | |
| and | |
| UNIVERSAL TRAVEL GROUP, INC., | |
| Nominal Defendant. | |

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Shaorong Liao ("Plaintiff"), by and through her undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") on behalf of nominal defendant Universal Travel Group, Inc. ("UTG" or the "Company") against certain current and/or former members of its Board of Directors (the "Board") and a former executive officer seeking to remedy defendants' conscious and willful breaches of fiduciary duties and unjust enrichment beginning January 19, 2010, and continuing through the present (the "Relevant Period").

## NATURE OF THE ACTION

1.     According to its filings with the U.S. Securities and Exchange Commission ("SEC"), UTG, a Nevada corporation headquartered in Shenzhen, People's Republic of China ("PRC"), is "engaged in the travel business, including airline ticketing, hotel reservation services, and packaged tours planning and tours guide services primarily in the PRC." UTG 3Q10 Form 10-Q, filed November 15, 2010.

2.     Beginning in early 2010, the Company issued a series of financial results and corresponding SEC filings that showing continuous substantial growth in revenues and steady increases in profits. The Company also went on a buying binge, gobbling up numerous purported competitors in China for what appeared to be relatively modest sums.

3.     However, in March 2011, a report by a prominent capital research company demonstrated that UTG's financials were a sham and its business model was not credible. It accused the Company of "fabricating its publicly filed financial statements." This was not the first time that the Company's financials and operations had been called into question; in September 2010, an Australian blogger raised many of the same issues.

4.     The March 2011 report noted prophetically that UTG investors should be leery because the Company had "burned through 4 low-quality auditors and 3 CFOs in 5 years." The

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

following month, the Company's then-current auditor publicly revolted against the Board by resigning, declaring among other things that it had "lost confidence" in the Board's "commitment to sound corporate governance and reliable financial reporting." The Company has since moved on to its fifth auditor in five years.

5. Shortly after the auditor's resignation, the NYSE, on which the Company's shares are listed, halted trading of UTG's shares. Trading has not resumed.

6. The members of the Board have consciously and willfully beached their fiduciary duties of good faith, loyalty, fair dealing and candor, and have consciously and willfully failed to use their utmost ability to control and manage UTG in a fair, just, honest, and equitable manner.

7. The Company, two directors, and a former officer are defendants in at least two lawsuits alleging violations of federal securities fraud law, and all of the Individual Defendants in the present action are also defendants in another pending shareholder derivative action.

8. By virtue of their conduct and the pendency of two federal securities actions based on substantially similar facts as the present matter, among other things, a majority of the Board cannot consider a demand to institute litigation against itself on behalf of the Company with the requisite disinterest and independence.

9. The Company has been damaged as a result of the Defendants' conscious and willful breaches of fiduciary duty and other misconduct.

## JURISDICTION AND VENUE

10. This Court has jurisdiction over all claims asserted herein pursuant to 28 U.S.C. § 1332(a)(3), because complete diversity exists between Plaintiff and each Defendant, Plaintiff being a citizen of California, Nominal Defendant being a Nevada corporation with its principal place of business in the PRC, and Defendants being, upon information and belief, citizens of

2

Maryland and the PRC, and the amount in controversy exceeds $75,000.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

11.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

12.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(a), (d) and 1401 because:  (i) Defendant Lee resides within this judicial district; and (ii) Defendants Jiang, Xie, Gao, Lizong Wang, Yuan, An, Liquan Wang, and Zhang are aliens and may be sued in any judicial district.

## THE PARTIES

13.     Plaintiff Liao is a current shareholder of UTG and has continuously held UTG stock at all relevant times.  Plaintiff Liao is a citizen of California.

14.     Nominal defendant UTG is a Nevada corporation headquartered in Shenzhen, PRC. According to its public filings, UTG is an independent, publicly owned company that is engaged in the travel business, including airline ticketing, hotel reservation services, and packaged tours planning and tours guide services, primarily in the PRC.  UTG offers package tours, air ticketing, and hotel reservation services via the internet and customer service representatives.  UTG shares are traded on the NYSE under the ticker symbol "UTA." The Company has been listed on the NYSE since October 27, 2009.

15.     Defendant Jiangping Jiang ("Jiang") was, at all relevant times, Chief Executive Officer ("CEO"), Chairperson of the Board, and a director of UTG.  She has served as Chair

3

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

and CEO of UTG since July 12, 2006.  According to UTG's amended annual Proxy Statement filed with the SEC on September 13, 2010, Jiang owns approximately 26% of the Company's common stock and earned $806,689 in total compensation in fiscal year 2009.  Upon information and belief, Jiang is a citizen of the PRC.

16.     Defendant Jing Xie ("Xie") was appointed Deputy General Manager in March 2005 and Secretary of the Board and Vice President in December 2006.  He was the Company's Chief Financial Officer ("CFO") from February 17, 2009, to August 17, 2009, and was re-appointed as Interim CFO on August 17, 2010.  Xie earned $15,844 in total compensation in fiscal year 2009.  Upon information and belief, Xie is a citizen of the PRC.

17.     Defendant Hujie Gao ("Gao") has been the Company's Vice President of Corporate Finance since 2005.  He joined the Board in 2008.  Gao earned $7,166 in total compensation in fiscal year 2009, an amount well above the average salary in Shenzen in 2009.  Upon information and belief, Gao is a citizen of the PRC.

18.     Defendant Lizong Wang ("Liz. Wang") has been a member of the Board since 2008.  According to the Company's web site, he is a member of UTG's Audit Committee.  Upon information and belief, Liz. Wang is a citizen of the PRC.

19.     Defendant Jiduan Yuan ("Yuan") has served as a director of the Company since 2008.  According to the Company's web site, Yuan is a member of the Audit Committee.  Upon information and belief, Yuan is a citizen of the PRC.

20.     Defendant Lawrence Lee ("Lee") has been a member of the Board since 2008.  Lee was appointed Chairperson of the Audit Committee on August 17, 2009.  Upon information and belief, Lee is a citizen of Maryland.

21.     Defendant Wenbin An ("An") has served as a director of the Company since October 11, 2010.  Upon information and belief, An is a citizen of the PRC.

4

22.     Defendant Liquan Wang ("Liq. Wang") was a director of the Company during the relevant period until on or about October 11, 2010.  He was replaced on the Board by Defendant An.  Upon information and belief, Liq. Wang is a citizen of the PRC.

23.     Defendant Yizhao Zhang ("Zhang") was the CFO of UTG between August 17, 2009 and August 16, 2010.  Before becoming CFO, Zhang was a member of the Board and Audit Chairman.  Zhang earned $228,201 in total compensation as an officer of UTG in fiscal year 2009.  Upon information and belief, Zhang is a citizen of the PRC.

24.     Collectively, defendants Jiang, Xie, Gao, Liz. Wang, Yuan, Lee, and An shall be referred to herein as the "Director Defendants," and they, along with defendants Liq. Wang and Zhang, shall be referred to as the "Individual Defendants."

## INDIVIDUAL DEFENDANTS' DUTIES

25.     By reason of their positions as directors and/or officers and fiduciaries of UTG, and because of their ability to control the business and corporate affairs of UTG, the Individual Defendants owed UTG and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage UTG in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of UTG and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to UTG and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

26.     Defendants, because of their positions of control and authority as directors and/or officers of UTG, were able to and did, directly and/or indirectly, consciously

5

commit and/or exercise control over the wrongful acts complained of herein. Because of their executive, managerial, and directors positions with UTG, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

27.     Once the members of the Board were placed on notice of material information concerning the Company's affairs, they were required to make immediate public disclosure of that information. Additionally, once the Board is put on notice of illegal conduct, the Board has a duty to act on that information.

28.     The Company has an Audit Committee.  According to its charter, it "is responsible for assisting the Board's oversight of (1) the quality and integrity of the Company's financial statements and related disclosure, (2) the Company's compliance with legal and regulatory requirements, (3) the independent auditor's qualifications and independence, and (4) the performance of the Company's internal audit function and independent auditors and internal controls."  Among other things, the Audit Committee:  is "directly responsible for making recommendation to the Board on the appointment, reappointment, retention, evaluation, oversight and termination of the work of the independent auditor employed by the Company (including resolution of disagreements between management and the independent auditor regarding reporting) for the purpose of preparing or issuing an audit report or performing other audit, review or attest services for the Company . . . and any questions of resignation or dismissal of that auditor;" "obtain[s] and review[s] with the lead audit partner and a more senior representative of the independent auditor, annually or more frequently as the Committee considers appropriate, a report by the independent auditor describing:  the independent auditor's internal quality-control procedures[,] any material issues raised by the most recent internal quality-control review, or peer review, of the independent auditor, or by any inquiry, review or investigation by governmental, professional or other regulatory authorities, within the preceding

6

five years, respecting independent audits carried out by the independent auditor;" "review[s] the experience, qualifications and performance of the senior members of the independent auditor team and . . . review[s] and monitor[s] the independent auditor's independence and objectivity and the effectiveness of the audit process in accordance with the applicable standard;" "review[s] the annual audited financial statements and any interim or quarterly financial statements or results with management and the independent auditor, including the Company's disclosures under 'Management's Discussion and Analysis of Financial Condition and Results of Operations,' before the filing of the Company's reports with the Securities and Exchange Commission and any other regulatory authority . . . monitor[s] integrity of financial statements of the Company and the Company's annual report and accounts, half-year report, quarterly reports and . . . review[s] significant financial reporting judgments contained in them;" "review[s] with management earnings press releases before they are issued;" "review[s] with the independent auditor:  (a) all critical accounting policies and practices to be used by the Company in preparing its financial statements and the auditor's judgment about the quality of the Company's accounting policies; management judgments and accounting estimates, audit judgments; (b) all alternative treatments of financial information within U.S. GAAP or any other applicable accounting standards that have been discussed with management, ramifications of the use of these alternative disclosures and treatments, and the treatment preferred by the independent auditor, (c) other material communications between the independent auditor and management, such as any management letter or schedule of unadjusted differences, reports on observations and recommendations on internal control, engagement letters, independence letters; any disagreements with management; consultation with other accountants; major issues discussed with management prior to retention; difficulties encountered in performing the audit; (d) potential effect on the financial statements of any significant risks and exposures, material

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

uncertainties, specifically going concern issues; (e) deficiencies in internal control; fraud and illegal acts; other information in documents containing audited financial information – the auditor's responsibility and any procedures performed and the results;" "review[s] with management, and any outside professionals as the Committee considers appropriate, the effectiveness of the Company's disclosure controls and procedures [and] review[s] the Company's financial controls;" "review[s] with management, the internal auditor and the independent auditor the quality, adequacy and effectiveness of the Company's internal controls and any significant deficiencies or material weaknesses in the design or operation of internal controls [and] discuss[es] with the management the system of internal control and ensure[s] that management has discharged its duty to have an effective internal control system;" and "discuss[es] with management, internal auditors and external auditors the nature and significance of any fraud involving senior management, any fraud causing a material misstatement of the financial statements, and any fraud that involves management or other employees who have a significant role in internal controls."

29.     Pursuant to the Company's Code of Ethics (the "Code of Ethics"), which applies to all Company officers and directors, the Company "seeks to conduct its business as a good corporate citizen and to comply with all laws, rules and regulations applicable to it or the conduct of its business."  Under the Code of Ethics, "[a]n Employee must comply fully with all laws, rules and regulations applying to the Company's business and its conduct in business matters. This includes, among other things, laws applying to . . . false or misleading financial information . . . ."  The Code of Ethics specifically requires "an Employee who has a concern about the Company's accounting practices, internal controls or auditing matters [to] report his or her concerns to the Corporate Legal Department."

30.     The Code of Ethics pays particular attention to what it terms "Quality of

Disclosure." It states:

> The Company is subject to certain reporting and disclosure requirements in the United States. As a result the Company will be regularly required to report its financial results and other material information about its business to the public and to regulators. The Company's policy is promptly to disclose accurate and complete information regarding its business, financial condition and results of operations. Each Employee must strictly comply with all applicable standards, laws, regulations and policies for accounting and financial reporting of transactions, estimates and forecasts. *Inaccurate, incomplete or untimely reporting will not be tolerated and can severely damage the Company and result in legal liability. Each Employee should be on guard for, and promptly report, any possibility of inaccurate of incomplete financial reporting. Particular attention should be paid to financial results that seem inconsistent with the performance of the underlying business,* transactions that do not seem to have an obvious business purpose, or and requests to circumvent ordinary review and approval procedures. The Company's senior financial officers and other employees working in the Finance Department have a special responsibility to ensure that all of the Company's financial disclosures are full, fair accurate, timely and understandable. Any practice or situation that might undermine this objective should be reported to the Corporate Legal Department. An Employee with information relating to questionable accounting or auditing matters may also confidentially, and anonymously if they desire, submit the information in writing to the Board's Audit Committee.

(Emphasis added). *Cf.* UTG 2010 10-K, 19 (filed with the SEC June 8, 2011) ("Our management . . . [is] generally unfamiliar with the requirements of the United States securities laws and may not appreciate the need to devote the resources necessary to comply with such laws. A failure to adequately respond to applicable securities laws could lead to investigations by the Securities and Exchange Commission and other regulatory authorities that could be costly, divert management's attention and disrupt our business.").

31.    The Company has additional requirements for "Senior Executive and Financial Officers," e.g., the CEO, CFO, senior vice presidents, general counsel, chief administrative officer, director of investment and investor relations, chief accounting officer and financial controller, that were established pursuant to section 406 of the Sarbanes-Oxley Act ("SOX"). The Company "expect[s] the highest possible honest and ethical conduct from our Senior Executive and Financial Officers. As a Senior Executive and Financial Officer, you are an

9

example for other employees and we expect you to foster a culture of transparency, integrity and honesty. Compliance with this Code is a condition to your employment and any violations of this Code may result in disciplinary action, up to and including termination of your employment."  They are subject to the following requirements regarding "Accurate Periodic Reports and Other Public Communications:"

> *As you are aware, full, fair, accurate, timely and understandable disclosure in our periodic reports filed with the SEC and in our other public communications is required by SEC rules and is essential to our continued success. You should exercise the highest standard of care in preparing such materials.* We have established the following guidelines in order to ensure the quality of our periodic reports.
>
> > • All Company accounting records, as well as reports produced from those records, must be kept and presented in accordance with the laws of each applicable jurisdiction.
> >
> > • All records must fairly and accurately reflect the transactions or occurrences to which they relate.
> >
> > • All records must fairly and accurately reflect in reasonable detail the Company's assets, liabilities, revenues and expenses.
> >
> > • The Company's accounting records must not contain any false or intentionally misleading entries.
> >
> > •☐No transaction may be intentionally misclassified as to accounts, departments or accounting periods or in any other manner.
> >
> > • All transactions must be supported by accurate documentation in reasonable detail and recorded in the proper account and in the proper accounting period.
> >
> > • No information may be concealed from the internal auditors or the independent auditors.
> >
> > • *Compliance with generally accepted accounting principles in the United States and the Company's system of internal accounting controls is required at all times.*

(Emphasis added).  Furthermore, Senior Executive and Financial Officers are advised that:

> You are expected to comply with both the letter and spirit of all applicable governmental laws, rules and regulations (including, but not limited to, insider

10

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

trading laws), as well as the relevant rules and regulations of NYSE Arca or the New York Stock Exchange, any other self-regulatory organization of which the Company is a member and this Code and to report any suspected violations of applicable governmental rules and regulations or this Code to the general counsel or the chief executive officer. No one will be subject to retaliation because of a good faith report of a suspected violation. If you fail to comply with this Code or any applicable laws or regulations, you may be subject to disciplinary measures, up to and including termination of your employment.

32.     The Code of Ethics contains the following Corporate Governance Guidelines applicable to directors:

The Board believes that in order to oversee the successful perpetuation of the Company's business, the Board should set policies (the "Code of Ethics") and regarding: (i) conflicts of interest; (ii) corporate opportunities; (iii) confidentiality; (iv) fair dealing; (v) protection and proper use of Company assets; (vi) compliance with laws, rules and regulations; and (vii) such other matters as the Board deems appropriate. The Code of Ethics should encourage the reporting of unethical or illegal behavior and ensure prompt and consistent action against violations of the Code of Ethics. *Any waivers to the Code of Ethics for directors or executive officers may only be made by the Board or a Board committee, if so delegated, and must be publicly disclosed in a prompt manner as required by applicable NYSE Rules and SEC Rules.*

(Emphasis added).  Regarding disclosure, the Corporate Governance Guidelines provide "[t]he Board believes that it is imperative that timely and accurate disclosure in compliance with applicable laws, rules and regulations is made on all material matters, including: (i) the Company's financial condition; (ii) the Company's financial performance; (iii) foreseeable risk factors for the Company; (iv) ownership of the Company; and (v) the amount and nature of equity compensation paid to directors and senior management of the Company. The Company has a responsibility to furnish information that is honest, intelligible, meaningful, timely, and broadly disseminated."

## SUBSTANTIVE ALLEGATIONS

33.     On January 19, 2010, the Company issued a press release announcing the acquisition of Hebei Tianyuan Travel Agency ("HTTA") for approximately $4.2 million. The announcement stated in relevant part:

11

**Universal Travel Group Announces Acquisition of Hebei Tianyuan Travel Agency**

SHENZHEN, China, January 19, 2010 – Universal Travel Group (NYSE: UTA) ("Universal Travel Group" or the "Company"), a leading travel services provider in China, today announced that it has entered into a Letter of Intent to acquire Hebei Tianyuan Travel Agency ("Tianyuan") for RMB 29 million (approximately $4.2 million), 80% of which shall be paid in cash and 20% of the consideration in shares of the Company's common stock. The purchase consideration may be subject to adjustment after completion of acquisition audit on Tianyuan by the Company.

Founded in 1999, Tianyuan was the first authorized travel agency in the Hebei Province in China. In addition, Tianyuan is the exclusive provider of travel agency services to Mount Lu and Lushan National Park, both domestic tourist attractions listed on the UNESCO World Heritage Site. Tianyuan was the organizer of the International Economy & Culture Communication Forum sponsored by the local government and the exclusive organizer of the Young Journalist Summer Camp sponsored by the Yanzhao Evening Paper. The Company believes that Taiyuan's exclusive service with these regional sites and unique partnership with the government provide Tianyuan with an advantage to be a market leader in travel services in the region. Unaudited full year 2009 revenues and net income for Tianyuan are approximately $7.2 million and $0.7 million, respectively.

"This acquisition represents a further step in our expansion strategy of increasing our geographic coverage over the most popular national tourist destinations in China such as Mount Lu," said Ms. Jiangping Jiang, Chairwoman and Chief Executive Officer. "We look forward to leveraging our experience in providing high quality, comprehensive travel services with Tianyuan's unique regional tourism resources and we are confident that this acquisition will stregnthen [sic] Universal Travel Group's domestic market presence and increase the Company's profitability in 2010."

34.    The above press release was also included as an exhibit to a Form 8-K the Company filed with the SEC on January 19, 2010.

35.    Just a week later, on January 26, 2010, UTG issued a press release announcing it acquired Zhengzhou Yulongkang Travel Service Company ("ZYT") for approximately $5.7 million. The Company claimed that ZYT had unaudited 2009 revenue and net income of about $10.5 million and $0.86 million, respectively. The press release stated:

**Universal Travel Group Announces Acquisition of Zhengzhou Yulongkang Travel Service Company**

12

SHENZHEN, China, January 26, 2010 – Universal Travel Group (NYSE: UTA) ("Universal Travel Group" or the "Company"), a leading travel services provider in China offering package tours, air ticketing, and hotel reservation services via the Internet and customer service representatives, announced today that it has entered into a Letter of Intent to acquire Zhengzhou Yulongkang Travel Service Company ("Zhengzhou Yulongkang") for RMB 39 million (approximately $5.7 million), 90% of which to be paid in cash and 10% of the purchase consideration in shares of the Company's common stock. The purchase consideration may be subject to adjustment after the completion of acquisition audit on Zhengzhou Yulongkang by the Company.

Zhengzhou Yulongkang was founded in 2000 in Zhengzhou, Henan Province. Zhengzhou Yulongkang has a team of experienced and knowledgeable tour guides that take tourists on more than ten proprietary regional routes and hundreds of points of interest. Zhengzhou Yulongkang is a one-stop shop, providing comprehensive travel services and maintaining long-term cooperation with transportation agents, travel destinations, hotels, and air ticket agencies. In addition, Zhengzhou Yulongkang has developed outdoor team building programs in 2004 based on its chosen travel destination, Wengcheng Waterfall. Unaudited 2009 revenue and net income will be about $10.5 million and $0.86 million, respectively.

"Our recent acquisitions of travel service providers of national tourist destinations demonstrate our commitment to expand into domestic travel markets and raise awareness of our Company and the services we provide in these targetted regions. Zhengzhou Yulongkang's addition will further enhance Universal Travel Group's core business segments and complement our packaged tour business," said Ms. Jiangping Jiang, Chairwoman and Chief Executive Officer. "Through these acquisitions, we will strengthen our product portfolio, geographic coverage and brand awareness to build a larger network of customers. We believe we are strategically positioned to be in the forefront of the rising China travel market."

36.     The above press release was also included as an exhibit to a Form 8-K the Company filed with the SEC on January 26, 2010.

37.     On March 5, 2010, the Company issued a press release entitled, "Universal Travel Group Announces Fourth Quarter and Full Year 2009 Results." The press release, as corrected on March 7, stated in relevant part:

**Universal Travel Group Announces Fourth Quarter and Full Year 2009 Results**

SHENZHEN, China, March 5 /PRNewswire-Asia-FirstCall/ — Universal Travel

13

Group (NYSE:UTA - News) ("Universal Travel Group" or the "Company"), a growing travel services provider in China offering package tours, air ticketing, and hotel reservation services online and via customer service representatives, today announced financial results for the fourth quarter and full year ended December 31, 2009.

Fourth Quarter 2009 Highlights
--     Revenue increased 16.1% year-over-year to $34.2 million
--     Gross profit increased 1.3% year-over-year to $10.1 million
--     Gross margin was 29.5%, compared to 33.8% in the prior year period
--     Income from operations was $7.5 million, compared to $8.2 million in the prior year period
--     Adjusted income from operations, which excludes the effect of on-cash charges related to stock-based compensation of $0.4 million, was $7.9 million, compared to $8.2 million in the prior year period(*)
--     GAAP net income from continuing operations was $5.2 million or $0.32 per diluted share, compared to $6.3 million or $0.44 per diluted share in the prior year period
--     Adjusted net income from continuing operations, which excludes the effect of non-cash charges related to the change in fair value of derivative liabilities of $0.3 million and stock-based compensation of $0.4 million, was $5.9 million, or $0.36 per diluted share, compared to $6.4 million, or $0.44 per diluted share, in the prior year period(*)

Full Year 2009 Highlights
--     Revenue increased 48.7% year-over-year to $97.9 million
--     Gross profit increased 43.8% year-over-year to $32.4 million
--     Gross margin was 33.1%, compared to 34.2% last year
--     GAAP income from operations increased 34.9% year-over-year to $24.2 million
--     Adjusted income from operations, which excludes the effect of non-cash charges related to stock-based compensation of $1.2 million, increased 39.7% year-over-year to $25.3 million(*)
--     GAAP net income from continuing operations was $11.3 million or $0.74 per diluted share, compared to $13.8 million or $1.07 per diluted share last year
--     Adjusted net income from continuing operations, which excludes the effect of non-cash charges related to the change in fair value of derivative liabilities of $6.8 million and stock-based compensation of $1.2 million, was $19.3 million, or $1.26 per diluted share, an increase of 38.1% compared to $14.0 million, or $1.09 per diluted share last year(*)

"Our fourth quarter and full year results reflect strong organic revenue growth," said Ms. Jiangping Jiang, Chairwoman and Chief Executive Officer. "The

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

greatest impact to our financial performance is from the growth of our business volume, since the average prices of our travel products and commission rates were stable, and some of them even decreased slightly during 2009. Our revenue growth reflects the continued development of the domestic tourism market in China and the strength of our operating platform. Universal Travel has a strong product portfolio, broad geographic coverage and a brand awareness that enable us to continue to expand our network of customers and remain at the forefront of the growing China travel market."

Fourth Quarter 2009 Financial Results

Revenue for the three months ended December 31, 2009, was $34.2 million compared to $29.4 million for the same period in 2008, an increase of approximately 16.1%. Revenue generated by the air cargo agency segment for the three months ended December 31, 2008 was $2.4 million. Excluding this segment, revenue generated from the current three segments was $27 million, a year-over-year increase of 26.6%.

Revenue from air-ticketing was $6.6 million, compared to $5.1 million for the same period last year, an increase of 29.6%. This increase was mainly due to the increased demand for air passenger transportation.

Revenue generated by the Company's hotel reservation segment was $4.0 million compared to $3.8 million for the same period in 2008, an increase of 5.5%. This increase was due to the successful integration of the various business segments of the Company.

Revenue generated by package tours was $23.6 million compared to $18.2 million for the same period in 2008, an increase of 30.0%. This increase was primarily due to the increase in tourism demand and successful integration of the Company's various business segments and marketing channels.

Gross profit was $10.1 million compared to $9.9 million for three months ended December 31, 2008, an increase of 1.3%. Gross profit margin for the fourth quarter of 2009 was 29.5% compared to 33.8% for the same period last year. The decrease in gross profit margin was primarily because the packaged tour business, which has a lower profit margin due to the way revenues are recognized, constituted a higher percentage of the Company's total revenues than during the prior year period.

Selling, general and administrative ("SG&A") expenses totaled $2.5 million compared to $1.7 million for the same period last year, an increase of 45.1%. The SG&A expenses were 7.4% of revenue for the three months ended December 31, 2009, compared to 5.9% for the same period last year. The increase in percentage was primarily due to higher amortization expenses related to the Company's employee stock incentive plan, higher marketing and rent expenses to support the increased sales volume, and additional professional fees.

15

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Income from operations was $7.5 million compared to $8.2 million in the same period last year. The Company incurred non-cash charges related to stock-based compensation of $0.4 million in the fourth quarter of 2009 compared to $0.1 million in the prior year period. Excluding these non-cash charges, the Company's adjusted income from operations was $7.9 million for the fourth quarter of 2009, compared to $8.2 million in the prior year period. Adjusted operating margin was 23.1%(*).

Net income from continuing operations was $5.2 million, or $0.32 per diluted share, compared to $6.3 million, or $0.44 per diluted share, for the same period last year. Excluding the effect of non-cash charges related to the change in fair value of derivative liabilities of $0.3 million and stock-based compensation of $0.4 million, the Company's adjusted net income from continuing operations was $5.9 million, or $0.36 per diluted share, compared to $6.4 million, or $0.44 per diluted share, in the fourth quarter of 2008(*).

Full Year 2009 Financial Results

Revenue for full year 2009 was $97.9 million compared to $65.8 million in 2008, an increase of 48.7%. Revenue from air-ticketing was $17.5 million compared to $12.3 million last year, an increase of 42.0%. Revenue generated by the hotel reservation segment was $13.0 million compared to $8.3 million last year, an increase of 56.4%. Revenue generated by package tours was $67.3 million compared to $45.1 million last year, an increase of 49.1%.

Gross profit was $32.4 million compared to $22.5 million for full year 2008, an increase of 43.8%. Gross profit margin for the full year of 2009 was 33.1% compared to 34.2% last year.

Income from operations increased 34.9% to $24.2 million from $17.9 million in the full year 2008. The Company incurred non-cash charges related to stock-based compensation in the full year 2009 of $1.2 million compared to $0.2 million last year.

Excluding these non-cash charge, the Company's adjusted income from operations would be $25.3 million for the full year 2009, an increase of 39.7% from last year. Adjusted operating margin was 25.8%(*).

Net income from continuing operations was $11.3 million compared to $13.8 million last year. The Company incurred non-cash charges related to the change in fair value of derivative liabilities of $6.8 million and stock-based compensation of $1.2 million in the full year 2009. Excluding these non-cash charges, adjusted net income from continuing operations would be $19.3 million, or $1.26 per fully diluted share, an increase of 38.1% from $14.0 million, or $1.09 per diluted share, in the full year 2008(*).

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

(*) See Table 1 for a reconciliation of operating income, net income and EPS to exclude non-cash charges related to the change in fair value of derivative liabilities and stock-based compensation.

Financial Condition

Cash and cash equivalents were $36.7 million as of December 31, 2009. Current assets and current liabilities as of December 31, 2009, were $70.5 million and $6.3 million, respectively, yielding working capital of $64.2 million. The Company has no long-term debt. For the year ended December 31, 2009, net cash provided by operating activities was $11.5 million.

SG&A expenses totaled $8.2 million compared to $4.6 million last year, an increase of 78.7%. SG&A expenses were 8.4% of revenue compared to 7.0% last year.

Recent Developments
-- In January 2010, the Company entered into a Letter of Intent to acquire Zhengzhou Yulongkang Travel Service Company for RMB 39 million (approximately $5.7 million), 90% of which to be paid in cash and 10% of the purchase consideration in shares of the Company's common stock.
-- In January 2010, the Company entered into a Letter of Intent to acquire Hebei Tianyuan Travel Agency for RMB 29 million (approximately $4.2 million), 80% of which shall be paid in cash and 20% of the consideration in shares of the Company's common stock.
-- In December 2009, the Company entered into a Letter of Intent to acquire Huangshan Holiday Travel Service Company for RMB 20 million (approximately $2.9 million), 80% of which shall be paid in cash and 20% in shares of the Company's common stock.
-- In December 2009, the Company entered into definitive subscription agreements to sell to institutional investors an aggregate of 2,222,222 shares of its common stock at a price of $9.00 per share for gross proceeds of approximately $20.0 million. The net proceeds of the financing are being used for acquisitions and working capital. The sale of the common stock closed on December 15, 2009.

Business Outlook

Universal Travel Group expects to continue to capitalize on the fast growing China travel market through organic growth and strategic acquisitions. The Company's business in the Pearl River Delta region continues to grow and its expansion into the Chongqing Delta region is on track. In addition, the Company has made significant progress identifying acquisition targets that it believes will help Universal Travel achieve its goal of further expanding its geographic footprint into additional regions of China. Following its $20 million financing in

17

December of last year, the Company announced its intention to acquire travel businesses in Anhui Province, Hebei Province, and Henan Province. Universal Travel plans to integrate and further expand these businesses in 2010.

Universal Travel Group is also planning a nationwide rollout of the TRIPEASY Travel Service Kiosks (the "Kiosks") within the next two years. In 2010, the Company plans to roll out an additional 1,400 Kiosks in certain selected cities in China. (By the end of 2009, Universal Travel Group had 623 Kiosks in place to serve its customers.) The Kiosks will enable customers to make travel related inquiries and book their travel without a computer or an internet connection. The Company will promote the Kiosks via local media such as newspapers, billboards and internet ads, including its own award-winning website, http://www.cnutg.com, as well as other related websites, which in turn will further the Company's brand recognition. The Company expects the Kiosks themselves to provide a strong media platform to strengthen Universal Travel Group's franchise.

Ms. Jiang commented, "We our [sic] optimistic about our business prospects. The travel market in China continues to show robust growth. We expect to see increasing sales and strong financial performance in 2010 as we integrate our recently announced acquisitions and as our comprehensive marketing initiatives continue to demonstrate positive results. In addition, the TRIPEASY Kiosks, which have shown promising results to date, will serve, together with our website and call center, to further integrate our air ticket sales, hotel room sales, and packaged tours businesses."

For the full year 2010, Universal Travel Group expects to achieve an organic growth rate of approximately 20% for revenues and net income.

38.     The Company's Form 10-K for 2009, which was filed with the SEC on March 5, 2010, stated the following about the ZYT and HTTA acquisitions:

On January 26, 2010, we entered into a letter of intent to acquire Zhengzhou Yulongkang Travel Service Company ("Zhengzhou Yulongkang") for RMB 39 million (approximately $5.7 million), 90% of which to be paid in cash and 10% of the purchase consideration in shares of the Company's common stock. The purchase consideration may be subject to adjustment after the completion of acquisition audit on Zhengzhou Yulongkang by the Company. Zhengzhou Yulongkang Travel Service Company was established in 2000 in Zhengzhou, Henan Province of China. The company currently has a management team of 25 people and over 60 tour organizers and guides. The Company provides comprehensive travel services and maintains long-term cooperation relations with transportation agents, travel destinations, hotels, and air ticket agencies. Its regional tour routes include "Charming Tibet", "Winter Hot Spring", "Passion Ski Trip", etc. Zhengzhou Yulongkang Travel Service Company has received a series of industry and corporate awards from 2003 to 2006.

18

On January 19, 2010, we entered into a letter of intent to acquire Hebei Tianyuan Travel Agency ("Tianyuan") for RMB 29 million (approximately $4.2 million), 80% of which shall be paid in cash and 20% of the consideration in shares of the Company's common stock. The purchase consideration may be subject to adjustment after completion of acquisition audit on Tianyuan by the Company. Founded in 1999, Tianyuan was the first authorized travel agency in the Hebei Province in China. In addition, Tianyuan is the exclusive provider of travel agency services to Mount Lu and Lushan National Park, both domestic tourist attractions listed on the UNESCO World Heritage Site. Tianyuan was the organizer of the International Economy & Culture Communication Forum sponsored by the local government and the exclusive organizer of the Young Journalist Summer Camp sponsored by the Yanzhao Evening Paper. We believe that Taiyuan's exclusive service with these regional sites and unique partnership with the government provides Tianyuan with an advantage to be a market leader in travel services in the region.

39.     The Form 10-K, which contained in more detail UTG's financial results for the fourth quarter of 2009 and fiscal year 2009, was signed by Individual Defendants Jiang and Zhang.     It was accompanied by the mandatory Sarbanes-Oxley certifications ("SOX Certifications"), signed by Defendants Jiang and Zhang, who declared:

1.     I have reviewed this annual report on Form 10-K of Universal Travel Group.

2.     Based on my knowledge, this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3.     Based on my knowledge, the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4.     The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) for the registrant and have:

a)     designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known

19

to us by others within those entities, particularly during the period in which this quarterly report is being prepared; and

b)    designed such internal controls over financial reporting, or caused such internal controls over financial reporting to be designed under our supervision, to provide reasonable assurances regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles; and

c)    evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d)    disclosed in this report any change in the registrant's internal controls over financial reporting that occurred during the registrant's fiscal quarter ended September 30, 2009, that has materially affected or is reasonably likely to materially affect the registrant's internal controls over financial reporting.

5..    The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent functions):

a)    all significant deficiencies and material weakness in the design or operation of internal controls over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial data; and

b)    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

40.    On March 29, 2010, the Company filed a Form 8-K with the SEC that stated in relevant part:

On March 29, 2010, our subsidiary, Shenzhen Universal Travel Agency Co. Ltd, executed an acquisition agreement (the "Tianyuan Agreement") to acquire all the equity interest of Hebei Tianyuan International Travel Agency Co., Ltd ("Tianyuan") with shareholders of Tianyuan and another acquisition agreement (the "Yulongkang Agreement") to acquire all the equity interest in Zhengzhou Yulongkang Travel Agency Co., Ltd with shareholders of Yulongkang.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

We had previously reported on a Current Report on Form 8-K on January 19, 2010 that we had entered into a letter of intent to acquire Tianyuan for RMB 29 million (approximately $4.2 million), 80% of which shall be paid in cash and 20% of the consideration in shares of the Company's common stock. The purchase consideration may be subject to adjustment after completion of acquisition audit on Tianyuan by the Company.

Pursuant to the Tianyuan Agreement, the purchase consideration was adjusted to RMB 30 million (approximately $4.4 million), which is payable as follows: (i) 20% of the purchase consideration is to be paid in shares of restricted common stock of the Company with a per stock price of $ 9.42, being the average closing price of the Company's shares for the 15 days prior to the date of execution of the Agreement and amounting to 93,283 shares of restricted common stock; (ii) 40% or RMB 12 million (approximately $1.76 million) to be paid within 10 days of the announcement of the acquisition; (iii) 20% or RMB 6 million (approximately, $882,353) within 10 days of completion of the share exchange formalities with the local business authorities and (iv) the remaining 20% of the purchase consideration within 10 days of the formal close of the acquisition transaction.

The shareholders of Tianyuan have agreed to continue their service at Tianyuan for the next five fiscal years and to accomplish certain projected financial goals. In the event that they or Tianyuan breach the Agreement, Shenzhen Universal Travel Agency Co. Ltd shall be entitled to terminate the Agreement and receive a full refund of the purchase consideration and up to $1 million in damages.

We had previously reported on a Current Report on Form 8-K on January 26, 2010 that we had entered into a letter of intent to acquire Yulongkang for RMB 39 million (approximately $5.7 million), 90% of which to be paid in cash and 10% of the purchase consideration in shares of the Company's common stock. The purchase consideration may be subject to adjustment after the completion of acquisition audit on Zhengzhou Yulongkang by the Company.

Pursuant to the Yulongkang Agreement, the purchase consideration remains at RMB 39 million as previously stipulated in the letter of intent, which is payable as follows: (i) 10% of the purchase consideration is to be paid in shares of restricted common stock of the Company with a per stock price of $ 9.42, being the average closing price of the Company's shares for the 15 days prior to the date of execution of the Agreement and amounting to 60,634 shares of restricted common stock; (ii) 45% or RMB 17.55 million (approximately $2.58 million) to be paid within 10 days of the announcement of the acquisition; (iii) 25% or RMB 9.75 million (approximately, $1.4 million) within 10 days of completion of the share exchange formalities with the local business authorities and (iv) the remaining 20% of the purchase consideration within 10 days of the formal close of the acquisition transaction.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

The shareholders of Yulongkang have agreed to continue their service at Yulongkang for the next five fiscal years and to accomplish certain projected financial goals. In the event that they or Yulongkang breach the Agreement, Shenzhen Universal Travel Agency Co. Ltd shall be entitled to terminate the Agreement and receive a full refund of the purchase consideration and up to $1 million in damages.

The issuance of shares of common stock pursuant to the Agreement will be exempt from registration in reliance upon Regulation S and Section 4(2) of the Securities Act of 1933, as amended. Shareholders of Tianyuan and Yulongkang are non-U.S. persons, as defined in Rule 902(k) of Regulation S, In addition, our shares will be issued without registration under Section 5 of the Securities Act in reliance on the exemption from registration contained in Section 4(2) of the Securities Act. Specifically, (1) we had determined that the they were knowledgeable and experienced in finance and business matters and thus they are able to evaluate the risks and merits of acquiring our securities; (2) they had advised us that they were able to bear the economic risk of purchasing our common stock; (3) we had provided them with access to the type of information normally provided in a prospectus; and (4) we did not use any form of public solicitation or general advertising in connection with the issuance of the shares.

41.     On March 31, 2010, the Company issued a press release announcing the completion of its acquisition of HTTA and ZYT. The announcement stated in relevant part:

SHENZREN, China, March 31 /PRNewswire-Asia-FirstCall/ -Universal Travel Group (NYSE:UTA) ("Universal Travel Group" or the "Company"), a leading travel services provider in China, today announced that the Company has completed the previously announced acquisitions of Huangshan Holiday Travel Service Co., Ltd. ("Huangshan Holiday"), Hebei Tianyuan International Travel Agency Co., Ltd. ("Tianyuan"), and Zhengzhou Yulongkang Travel Agency Co., Ltd. ("Yulongkang").

The Company acquired Huangshan Holiday for RMB 20 million (approximately $2.9 million), of which 80% is in cash and 20% in stock; Tianyuan for RMB 30 million (approximately $4.4 million), of which 80% is in cash and 20% in stock; and Yulongkang for RMB 39 million (approximately $5.7 million), of which 90% is in cash and 10% in stock.

Huangshan Holiday provides comprehensive travel services in the Huangshan District in the Anhui Province of China. Huangshan, a national geological park and UNESCO World Heritage Site, is one of China's most popular travel destinations, with over eight million tourists annually. Huangshan Holiday provides guided and self-guided package tours and airline and hotel reservation services for both leisure and business travelers. Huangshan Holiday serves as the exclusive hotel reservation agency for several major online travel service

22

providers in China and has an over 70% share of the mid- to high-end hotel reservation market in the Huangshan Tourism District.

Tianyuan was founded in 1999 and was the first authorized travel agency in the Hebei Province in China. In addition, Tianyuan is the exclusive provider of travel agency services to Mount Lu and Lushan National Park, a domestic tourist attraction listed on the UNESCO World Heritage Site. Tianyuan's exclusive service with these regional sites and unique partnership with the government provide Tianyuan with an advantage to be a market leader in travel services in the region. Yulongkang provides comprehensive travel services and maintains long-term cooperation agreements with transportation agents, travel destinations, hotels, and air ticket agencies. In addition, Zhengzhou Yulongkang has developed outdoor team building programs based on its main travel market which is the Wengcheng Waterfall.

"We are pleased to have completed our recently announced strategic acquisitions," said Ms. Jiangping Jiang, Chairwoman and Chief Executive Officer. "These acquisitions of travel service providers for national tourist destinations in China demonstrate our commitment to expanding into additional domestic travel markets and raise the awareness of our Company and the services we provide in these targeted regions. Through these acquisitions we are strengthening our product portfolio, geographic coverage and brand awareness to build a larger network of customers. Overall, we believe these acquisitions will help us to strategically position Universal Travel Group to be in the forefront of the growing China travel market."

The Company also announced that the financial results from these three acquisitions will be included in the Company's quarterly report for the three months ended March 31, 2010. In addition, as a result of the synergy from these three acquisitions, for full year 2010, the Company expects to achieve a growth rate range of between 45% and 55% in both revenues and net income, excluding the effect of non-cash charges related to the change in fair value of derivative liabilities and stock-based compensation.

42.      The Company's buying spree was just beginning.   On May 4, 2010 the Company issued a press release announcing its intent to acquire four travel agencies for $19.5 million.  The press release stated:

**Universal Travel Group Announces Intention to Acquire Four Travel Agencies for a Total Purchase Consideration of $19.5 Million**

SHENZHEN, China, May 4 /PRNewswire -Asia-FirstCall/ -- Universal Travel Group (NYSE:UTA - News) ("Universal Travel Group" or the "Company"), a leading travel services provider in China, today announced that the Company has entered into letters of intent to acquire four travel agency businesses in China -- Tianjin Hongxun Aviation Agency Co., Ltd.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

("Tianjin Hongxun["]), Shanxi Jinyang Travel Agency Co., Ltd. ("Shanxi Jinyang"), Kunming Business Travel Agency Co., Ltd. ("Kunming Business Travel"), and Shandong Century Aviation Development Co., Ltd. ("Shandong Century") -- for a total purchase consideration of $19.5 million. The combined unaudited 2009 revenue and net income for the four travel agencies were $23.0 million and $3.0 million, respectively. The final purchase consideration each of these companies may be subject to adjustment after completion of due diligence by the Company.

Shanxi Jinyang was founded in 1988 in Taiyuan, Shanxi Province and is one of the largest travel agencies in Shanxi Province in terms of tourist volume and revenues. Shanxi Jinyang provides comprehensive travel services and has good business relationships with travel destinations, hotels, and air ticketing agencies. Unaudited 2009 revenue and net income were $5.6 million and $0.4 million, respectively. We plan to acquire Shanxi Jinyang for $2.3 million, 90% of which shall be paid in cash and 10% in shares of the Company's common stock.

Tianjin Hongxun was founded in 1999 in Tianjin and is a leading airline ticket agency in its region, with supplementary hotel, train and car reservation service offerings. Tianjin Hongxun has a customer database of approximately 400,000 that consists of both individual tourists and businesses and has an average daily volume of 100,000 inbound calls and over 2,000 tickets issued. Unaudited 2009 revenue and net income were $3.7 million and $0.9 million, respectively. We plan to acquire Tianjin Hongxun for $5.9 million, 65% of which shall be paid in cash and 35% in shares of the Company's common stock.

Kunming Business Travel was founded in 1993 in Kunming, Yunnan Province and is the premier golf travel service agency in its region. Kunming Business Travel has partnerships with seven golf clubs and provides services, including reservations, event planning, hosting business trips and golf competitions. Kunming Business Travel is the only professional golf travel service provider in the Yunnan Province. Unaudited 2009 revenue and net income were $9.4 million and $0.9 million, respectively. We plan to acquire Kunming Business Travel for $5.7 million, 90% of which shall be paid in cash and 10% in shares of the Company's common stock.

Shandong Century, founded in 1996, has the largest electronic ticket reservation platform and is the largest airline ticket agency in the Shandong Province. Its major business lines include air ticketing, hotel reservation, train ticketing, group tours, and business cargo services. Shandong Century has a call center with 100 customer service representatives and an average daily volume of 2,500 ticket reservations. Unaudited 2009 revenue and net income were $4.4 million and $0.8 million, respectively. We plan to acquire Kunming Century for $5.6 million, 65% of which shall be paid in cash and 35% in shares of the Company's common stock.

24

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

"We are continuing to capitalize on the fast growing China travel market through organic growth and strategic acquisitions," said Ms. Jiangping Jiang, Chairwoman and Chief Executive Officer. "After the acquisition of these four travel agencies, we will have expanded our geographic coverage to ten provinces in mainland China and the variety of services we offer our clients. We are confident these acquisitions, once complete, will have a positive impact on our top and bottom line in 2010."

43.     The above press release was also included as an exhibit to a Form 8-K the Company filed with the SEC on May 6, 2010.

44.     The letters of intent to acquire the four entities were also discussed in UTG's Form 10-Q for 1Q10, which was filed with the SEC on May 11, 2010. It was noted therein that:

On March [sic] 4, 2010, the company announced that it has entered into letters of intent to acquire four travel agency businesses in China – Tianjin Hongxun Aviation Agency Co., Ltd. ("Tianjin Hongxun"), Shanxi Jinyang Travel Agency Co., Ltd. ("Shanxi Jingyang"), Kunming Business travel Agency Co., Ltd. ("Kunming Business Travel"), and Shandong Century Aviation Development Co., Ltd. ("Shandong Century") – for a total purchase consideration of $19.5 million. The combined unaudited 2009 revenue and net income for the four travel agencies were $23.0 million and $3.0 million, respectively. The final purchase consideration each of these companies may be subject to adjustment after completion of the diligence by the Company.

                    *                    *                    *

Recently in May 2010, we also announced our intention of acquiring four more travel agency businesses inthe People's Republic of China – Tianjin Hongxun Aviation Agency Co., Ltd. ("Tianjin Hongxun"), Shanxi Jinyang Travel Agency Co., Ltd. ("Shanxi Jinyang"), Kunming Business Travel Agency Co., Ltd. ("Kunming Business Travel"), and Shandong Century Aviation Development Co., Ltd. ("Shandong Century").

We believe that we are able to improve the sales volume and operation efficiency of these new acquisitions, and on the other hand, they will also help lift the sales volume and operation efficiency of our existing subsidiaries.

45.     The Form 10-Q was signed by Individual Defendants Jiang and Zhang. They also executed SOX Certifications substantially similar to those accompanying the Form 10-K.

46.     The Company also issued a press release on May 11, 2010, announcing its results for 1Q10, which were also contained in the Form 10-Q. The press release stated in

25

1  relevant part:

2     SHENZHEN, China, May 11 /PRNewswire-Asia-FirstCall/ -- Universal Travel
3     Group (NYSE:UTA) ("Universal Travel Group" or the "Company"), a growing
      travel services provider in China offering package tours, air ticketing, and hotel
4     reservation services online and via customer service representatives, today
5     announced financial results for the first quarter ended March 31, 2010.

6          First Quarter 2010 Highlights
           --    Revenue increased 68.5% year-over-year to $26.1 million
7          --    Excluding contribution of newly acquired businesses, revenue
                 increased 34.5% year-over-year
8          --    Gross profit increased 39.5% year-over-year to $8.5 million
9          --    Gross margin was 32.5%, compared to 39.3% in the prior year
                 period
10         --    Income from operations was $5.4 million, compared to $4.2
                 million in the prior year period
11         --    Adjusted income from operations, which excludes the effect of
                 non-cash charges related to stock-based compensation of $0.3
12               million, was $5.8 million, compared to $4.4 million in the prior
                 year period*
13         --    GAAP net income from continuing operations was $4.1 million or
14               $0.23 per diluted share, compared to $3.2 million or $0.23 per
                 diluted share in the prior year period
15         --    Adjusted net income from continuing operations, which excludes
16               the effect of the non-cash gain on change in fair value of
                 derivative
17               liabilities of $0.1 million and the non-cash charge related to stock-
                 based compensation of $0.3 million, was $4.3 million, or $0.24
18               per
19               diluted share, compared to $3.3 million, or $0.24 per diluted
                 share, in the prior year period*
20         --    Acquired three travel agencies in China

21    "Our strong first quarter performance was driven by organic revenue growth and
      the financial results from our three recent acquisitions," said Ms. Jiangping
22    Jiang, Chairwoman and Chief Executive Officer. "Our organic sales growth was
      primarily driven by our successful efforts in cross-marketing and cross-selling
23    our travel related products across our three business segments, along with the
      strong demand for travel as a result of the healthy Chinese economy and the
24    continuing positive impact from the Chinese government's stimulus package. We
25    also benefited from increased brand awareness from both our online presence
      and from the deployment of our TRIPEASY kiosks."
26
      First Quarter 2010 Financial Results
27
28    Revenue for the three months ended March 31, 2010, was $26.1 million
      compared to $15.5 million for the same period in 2009, an increase of 68.5%. In

                                        26

March 2010, the Company completed the acquisitions of Huangshan Holiday Travel Service Co., Ltd. ("Huangshan Holiday"), Hebei Tianyuan International Travel Agency Co., Ltd. ("Tianyuan"), and Zhengzhou Yulongkang Travel Agency Co., Ltd. ("Yulongkang"). The revenue contribution from these three newly acquired subsidiaries in the first quarter of 2010 was $5.3 million, or 20.2% of the Company's total revenues for the quarter. Excluding the contribution of these newly acquired businesses, revenue for the first quarter of 2010 was $20.8 million, an increase of 34.5% from $15.5 million in the same period last year.

Revenue from air-ticketing was $4.4 million, compared to $2.8 million for the same period last year, an increase of 61.3%. This increase was mainly due to the increased demand for air passenger transportation and sales from the Company's Chongqing subsidiary as consumers across China are traveling more as the domestic economy recovers. In order to capitalize on the opportunities arising from the economic promotion by the Chinese government of the mid and western regions of the PRC, the Company strategically set up Chongqing Universal Travel E-Business Co., Ltd. to strengthen its presence in that region in the second quarter of 2009. The Chongqing subsidiary began generating revenues in the third quarter of 2009.

Revenue generated by the Company's hotel reservation segment was $3.2 million compared to $2.5 million for the same period in 2009, an increase of 25.2%. This increase was also due to healthy market demand and the Company's ability to successfully cross market across its three business segments.

Revenue generated by package tours was $18.5 million compared to $10.2 million for the same period in 2009, an increase of 81.0% from the same period last year. This increase was a result of the three recent acquisitions, the recovery of the domestic economy, the positive impact from the government's stimulus package, and the Company's strong efforts in carrying our various marketing programs and campaigns.

Gross profit was $8.5 million compared to $6.1 million for the same period last year, an increase of 39.5%. Gross profit margin for the first quarter of 2010 was 32.5% compared to 39.3% for the same period last year. The decrease in gross profit margin was primarily because the packaged tour business, which has a lower profit margin due to the way revenues are recognized, constituted a higher percentage of the Company's total revenues than during the prior year period.

Selling, general and administrative ("SG&A") expenses totaled $3.1 million compared to $1.9 million for the same period last year, an increase of 65.1%. The SG&A expenses were 11.7% of revenue for the three months ended March 31, 2010, compared to 12.0% for the same period last year. General increase in selling, general and administrative expenses are in tandem with the growth in business operations during the three months ended March 31, 2010, as compared to the same period of last year. During the first quarter of 2010, the Company incurred extra professional fees and consolidation expenses for the three

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

acquisitions. In addition, the slight increase in percentage was also due to the issuance of stock based compensation in early 2009 and the amortization of such stock based compensation, whereas the stock based compensation is less significant during the same period last year.

Income from operations was $5.4 million compared to $4.2 million in the same period last year. The Company incurred non-cash charges related to stock-based compensation of $0.3 million in the first quarter of 2010 compared to $0.2 million in the prior year period. Excluding these non-cash charges, the Company's adjusted income from operations was $5.8 million for the first quarter of 2010, compared to $4.4 million in the prior year period. Adjusted operating margin was 22.1%.*

Net income from continuing operations was $4.1 million, or $0.23 per diluted share, compared to $3.4 million, or $0.23 per diluted share, for the same period last year. Excluding the effect of the non-cash gain on change in fair value of derivative liabilities of $0.1 million and the non-cash charge related to stock-based compensation of $0.3 million, the Company's adjusted net income from continuing operations was $4.3 million, or $0.24 per diluted share, compared to $3.3 million, or $0.24 per diluted share, in the first quarter of 2009.*

   * See Table 1 for a reconciliation of operating income, net income and EPS
     to exclude the non-cash gain on change in fair value of derivative
     liabilities and the non-cash charge related to stock-based compensation.

Financial Condition

Cash and cash equivalents were $37.8 million as of March 31, 2010. Current assets and current liabilities as of March 31, 2010, were $69.8 million and $11.0 million, respectively, yielding working capital of $58.8 million. The Company has no long-term debt. For the quarter ended March 31, 2010, net cash provided by operating activities was $6.5 million.

   Recent Developments
   --   In March 2010, the Company acquired the following three travel
        agencies in China: (i) Huangshan Holiday for approximately $2.9
        million, of which 80% was in cash and 20% in stock; (ii)
        Tianyuan for approximately $4.4 million, of which 80% was in
        cash and 20% in stock; and (iii) Yulongkang for approximately
        $5.7 million, of which 90% was in cash and 10% in stock.
   --   In April 2010, the Company entered into letters of intent to
        acquire
        the following four travel agencies in China for a total purchase
        consideration of $19.5 million: (i) Tianjin Hongxun Aviation
        Agency Co., Ltd.; (ii) Shanxi Jinyang Travel Agency Co., Ltd.;
        (iii) Kunming Business Travel Agency Co., Ltd.; and (iv)
        Shandong Century Aviation Development Co., Ltd.    The
        combined

28

unaudited 2009 revenue and net income for the four travel
agencies were $23.0 million and $3.0 million, respectively.

Business Outlook

Ms. Jiang commented, "We are optimistic about our business prospects. Our
main base of operations in Shenzhen in the Pearl River Delta region of China
continues to perform well and the expansion of our business into Western China,
through our second home base in the Chongqing Delta region is ramping up
nicely. We are very pleased with our recently completed acquisitions as they
were made at attractive valuations and enable Universal Travel Group to expand
into additional under-penetrated domestic travel markets.

"Our three newly acquired businesses are traditional travel agencies with a
minimal online presence and the bulk of their business comes from selling
package tours. As such, we see many opportunities to improve sales and
profitability by expanding their online bookings and air ticketing and hotel
reservation sales as we integrate these businesses and their customers into our
wider travel platform over the coming weeks and months. We expect this
initiative not only to increase sales, but also to help improve overall margin
performance given that online bookings, air ticketing and hotel reservations all
have higher margins than sales via customer service representatives and, given
the way revenues are recognized, sales of package tours. We expect to see the
results of our efforts as the year progresses and expect stronger overall margin
performance in the second half of 2010 as a result of these initiatives, but also
because the package tour business is seasonal and the third and fourth quarters
typically outperform the first two quarters of the year.

"We recently announced our intent to acquire an additional four travel agencies
in China. These companies have a greater focus on air ticketing and hotel
reservations versus package tours. Following the closing of these acquisitions,
our geographic coverage will have expanded to ten provinces in mainland China
and we are confident that these acquisitions will have a positive impact on our
top and bottom line performance for the year and beyond."

For full year 2010, the Company reiterates its previously issued guidance of
achieving a growth rate range of between 45% and 55% in both revenues and net
income, excluding the effect of non-cash charges related to the change in fair
value of derivative liabilities and stock-based compensation. This guidance does
not include any impact from the four companies the Company has announced it
is in the process of acquiring.

47.     On June 16, 2010, the Company issued a press release entitled "Universal Travel

Group Prices $20 Million Offering of Common Stock."  The press release stated in relevant

part:

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

SHENZHEN, China, June 16 /PRNewswire-Asia-FirstCall/ -- Universal Travel Group (NYSE:UTA) ("Universal Travel Group" or the "Company"), a leading travel services provider in China, today announced the pricing of a public offering of 2,857,143 shares of its common stock at $7.00 per share. The offering is expected to close on Monday, June 21, 2010.  In addition, Universal Travel Group has granted the underwriters a 30-day option to purchase up to an additional 428,572 shares of its common stock to cover over-allotments, if any. Brean Murray, Carret & Co., LLC is acting as sole book running manager and Rodman & Renshaw, LLC is acting a co-manager for the offering.

"We are pleased to announce the pricing of this transaction and appreciate the support of our new and existing investors," commented Ms. Jiangping Jiang, Chairwoman and Chief Executive Officer. *"The proceeds from this financing will be used to fund the cash portion of the four recently announced acquisitions and for working capital to expand our core business segments.* We believe the offering will accelerate the closing of these acquisitions and make a positive contribution to our revenue growth, increased earnings and EPS performance."

(Emphasis added).

48.    The above press release was also included as an exhibit to a Form 8-K the Company filed with the SEC on June 16, 2010.

49.    Just six days later, on June 22, 2010, the Company issued a press release entitled "Universal Travel Group Closes $20 Million Offering of Common Stock."  The press release stated in relevant part:

SHENZHEN, China, June 22 /PRNewswire-Asia-FirstCall/ -- Universal Travel Group (NYSE:UTA) ("Universal Travel Group" or the "Company"), a leading travel services provider in China, today announced that on June 21, 2010 the Company closed the common stock offering announced on June 16, 2010. In this transaction, the Company issued 2,857,143 shares of its common stock at $7.00 per share for an aggregate amount of $20 million. Brean Murray, Carret & Co. acted as sole book running manager and Rodman & Renshaw, LLC acted as co-manager for the offering.

*The proceeds from this financing will be used to fund the cash portion of its four recently announced acquisitions and for working capital to expand the Company's core business segments.*

(Emphasis added).

50.    The above press release was also included as an exhibit to a Form 8-K the Company filed with the SEC on June 22, 2010.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

51.     On June 30, 2010, the Company issued a press release entitled "Universal Travel Group Completes Acquisitions of Shanxi Jinyang Travel Agency and Kunming Business Travel Agency." The press release stated in relevant part:

SHENZHEN, China, June 30 /PRNewswire-Asia-FirstCall/ -- Universal Travel Group (NYSE:UTA) ("Universal Travel Group" or the "Company"), a leading travel services provider in China offering package tours, air ticketing, and hotel reservation services, today announced that the Company has completed the previously announced acquisitions of Shanxi Jinyang Travel Agency Co., Ltd. ("Shanxi Jinyang") and Kunming Business Travel Agency Co., Ltd. ("Kunming Business Travel") for $8.0 million, of which 90% was paid in cash and 10% in stock. The combined audited 2009 revenue and net income for the two travel agencies was $15.3 million and $1.3 million, respectively.

Shanxi Jinyang was founded in 1988 in Taiyuan, Shanxi Province and is one of the largest travel agencies in Shanxi Province in terms of tourist volume and revenues. Shanxi Jinyang provides comprehensive travel services and has established business relationships with local travel destinations, hotels, and air ticketing agencies.

Kunming Business Travel was founded in 1993 in Kunming, Yunnan Province and is the premier golf travel service agency in its region. Kunming Business Travel has partnerships with seven golf clubs and provides services, including reservations, event planning, hosting business trips and golf competitions. Kunming Business Travel is the only professional golf travel service provider in the Yunnan Province.

With the closing of these two acquisitions, assuming no further dilutive effect from financings or acquisitions, the Company now expects to achieve between $145.0 million and $155.0 million in revenue, $27.0 million and $28.0 million in net income, and $1.35 and $1.40 in diluted EPS in the fiscal year 2010, excluding the effect of non-cash charges related to the change in fair value of derivative liabilities and stock-based compensation.

"We are very pleased to have closed the first two of our recently announced four acquisitions on schedule," said Ms. Jiangping Jiang, Chairwoman and Chief Executive Officer. "These acquisitions of travel service providers will help us to further expand our geographic coverage in the fast growing domestic travel market. We believe Universal Travel Group's comprehensive service platform and broad customer reach will enable us to further improve their earnings and profit margins."

52.     The above press release was also included as an exhibit to a Form 8-K the Company filed with the SEC on June 30, 2010.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

53.    The recent acquisitions of Shanxi Jinyang and Kunming Business Travel were also discussed in UTG's Form 10-Q for 2Q10, which was filed with the SEC on August 10, 2010 (and amended on August 12, 2010).

54.    The Form 10-Q was signed by Individual Defendants Jiang and Zhang.  They also executed SOX Certifications substantially similar to those accompanying the Form 10-K. The Form 10-Q also contained the Company's 2Q10 results, as discussed in the press release it issued the same day.

55.    Also on August 10, 2010, the Company issued a press release entitled "Universal Travel Group Announces Second Quarter 2010 Results."  It stated in relevant part:

> SHENZHEN, China, Aug. 10 /PRNewswire-Asia-FirstCall/ -- Universal Travel Group (NYSE:UTA) ("Universal Travel Group" or the "Company"), a leading travel services provider in China offering package tours, air ticketing, and hotel reservation services online and via customer service representatives, today announced financial results for the three and six months ended June 30, 2010.
>
> Second Quarter 2010 Highlights
> --    Revenue increased 99.6% year-over-year to $36.7 million
> --    Excluding contribution of newly acquired businesses, revenue increased 36.4% year-over-year
> --    Gross profit increased 61.6% year-over-year to $10.6 million
> --    Gross margin was 28.7%, compared to 35.5% in the prior year period
> --    Income from operations increased 42.8% to $7.1 million
> --    Adjusted income from operations, which excludes the effect of non-cash charges related to stock-based compensation of $0.3 million, increased 40.4% to $7.4 million(*)
> --    GAAP net income from continuing operations was $6.0 million or $0.33 per diluted share, compared to a loss of $1.9 million or $0.13 per diluted share in the prior year period
> --    Adjusted net income from continuing operations, which excludes the effect of the non-cash gain on change in fair value of derivative liabilities of $0.8 million and the non-cash charge related to stock-based compensation of $0.3 million, increased 29.3% to $5.5 million, or $0.30 per diluted share(*)
> --    Acquired two travel service providers in China
>
> "We are pleased to announce another quarter of strong growth in our business," said Ms. Jiangping Jiang, Chairwoman and Chief Executive Officer. "Our second quarter sales grew both organically and via our recently closed acquisitions.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

During the quarter, we saw strong demand for our travel services as the Chinese economy continues to expand, providing more and more consumers in China with disposal income for travel and tourism. We continue to see success in cross-marketing and selling our travel related products across our three business segments and increased brand awareness from our online presence and the deployment of our TRIPEASY kiosks."

Second Quarter 2010 Financial Results

Revenue for the three months ended June 30, 2010, was $36.7 million compared to $18.4 million for the same period in 2009, an increase of 99.6%. In March 2010, the Company completed the acquisitions of Huangshan Holiday Travel Service Co., Ltd., Hebei Tianyuan International Travel Agency Co., Ltd., and Zhengzhou Yulongkang Travel Agency Co., Ltd. In June 2010, the Company completed the acquisitions of Shanxi Jinyang Travel Agency Co., Ltd. and Kunming Business Travel Agency Co., Ltd. The revenue contribution from these five newly acquired businesses in the second quarter of 2010 was $11.6 million, or 31.7% of the Company's total revenues for the quarter. Excluding the contribution of these newly acquired businesses, revenue for the second quarter of 2010 was $25.1 million, an increase of 36.4% from $18.4 million in the same period last year.

Revenue from air-ticketing was $6.0 million, compared to $3.3 million for the same period last year, an increase of 82.3%. This increase was mainly due to increased demand for air passenger transportation and higher ticket prices.

Revenue generated by the Company's hotel reservation segment was $3.0 million compared to $2.7 million for the same period in 2009, an increase of 11.2%. This increase was mainly due to healthy market demand and the Company's ability to successfully cross-market across its three business segments.

Revenue generated by package tours was $27.7 million compared to $12.4 million for the same period in 2009, an increase of 123.6% from the same period last year. This increase was primarily the result of the five recent acquisitions, the recovery of the domestic economy, the positive impact from the government's stimulus package, and the Company's strong efforts in carrying out various marketing programs.

Gross profit was $10.6 million compared to $6.5 million for the same period last year, an increase of 61.6%. Gross profit margin was 28.7% compared to 35.5% for the same period last year. The decrease in gross profit margin was primarily because the packaged tour business, which has a lower profit margin due to the way revenues are recognized, constituted a higher percentage of the Company's total revenues than during the prior year period.

Selling, general and administrative ("SG&A") expenses totaled $3.5 million compared to $1.6 million for the same period last year, an increase of 121.2%.

33

The SG&A expenses were 9.4% of revenue compared to 8.5% for the same period last year. The increase in SG&A expenses is in connection with the growth in business operations during the three months ended June 30, 2010, as compared to the same period of last year. In addition, during the second quarter of 2010, the Company incurred extra professional fees and consolidation expenses related to the businesses it acquired, as well as from the $20 million common stock offering in June. The Company also incurred increased advertising expenses this quarter relative to the same period last year. In addition, in the second half of 2009 the Company established two subsidiaries (Chongqing Universal Travel E-Business Co., Ltd and Shenzhen Universal Travel Agency Co. Ltd.) and depreciation and amortization expenses for these subsidiaries have been taken into account since the third quarter of 2009.

Income from operations was $7.1 million compared to $5.0 million in the same period last year, an increase of 42.8%. The Company incurred non-cash charges related to stock-based compensation of $0.3 million in the second quarter of 2010, the same amount as in the prior year period. Excluding these non-cash charges, the Company's adjusted income from operations was $7.4 million for the second quarter of 2010, compared to $5.3 million in the prior year period, an increase of 40.4%. Adjusted operating margin was 20.2%.(*)

Net income from continuing operations was $6.0 million, or $0.33 per diluted share, compared to a loss of $1.9 million, or $0.13 per diluted share, for the same period last year. Excluding the effect of the non-cash gain on change in fair value of derivative liabilities of $0.8 million and the non-cash charge related to stock-based compensation of $0.3 million, the Company's adjusted net income from continuing operations was $5.5 million, or $0.30 per diluted share, compared to $4.3 million, or $0.30 per diluted share, in the second quarter of 2009.(*)

Ms. Jiang added, "Our bottom line performance benefited from our strong sales growth and higher margins in our air ticketing business as airlines in China increased prices in response to the booming travel market. This was offset by an increased proportion of our sales coming from package tours, which have a lower profit margin due to the way revenues are recognized, as well as from lower margins when compared to last year in our hotel reservation segment and our package tour business. The slight decrease in our hotel reservation margin was due to a year-over-year reclassification of costs. The decrease in margin in our package tour business was the result of the five travel service providers we acquired having lower margins than our existing business. Although currently these businesses have lower profit margins than our existing business, we expect their margin contribution to improve as we integrate them into our platform, and their strong local networks are critical in our nationwide expansion strategy."

(*) See table at the end of this press release for a reconciliation of operating income, net income and EPS to exclude the non-cash gain on change in fair value of derivative liabilities and the non-cash charge related to stock-based compensation.

34

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Six Months Results

Revenue for the six months ended June 30, 2010, was $62.9 million compared to $33.9 million for the same period in 2009, an increase of 85.4%. The revenue contribution from the Company's five newly acquired businesses in the first half of 2010 was $16.9 million, or 26.9% of the Company's total revenues for the first half. Excluding the contribution of these newly acquired businesses, revenue for the first half of 2010 was $46.0 million, an increase of 35.5% from $33.9 million in the same period last year.

Revenue from air-ticketing was $10.4 million, compared to $6.0 million for the same period last year, an increase of 72.7%. Revenue generated by the Company's hotel reservation segment was $6.2 million compared to $5.2 million for the same period in 2009, an increase of 17.9%. Revenue generated by package tours was $46.3 million compared to $22.6 million for the same period in 2009, an increase of 104.3% from the same period last year.

Gross profit was $19.1 million compared to $12.3 million for the same period last year, an increase of 54.9%. Gross profit margin was 30.3% compared to 36.3% for the same period last year.

Selling, general and administrative ("SG&A") expenses totaled $6.5 million compared to $3.1 million for the same period last year, an increase of 110.6%. The SG&A expenses were 10.4% of revenue compared to 9.1% for the same period last year.

Income from operations was $12.5 million compared to $9.2 million in the same period last year, an increase of 36.1%. The Company incurred non-cash charges related to stock-based compensation of $0.7 million in the first half of 2010 compared to $0.5 million in the prior year period. Excluding these non-cash charges, the Company's adjusted income from operations was $13.2 million for the first half of 2010, compared to $9.7 million in the prior year period, an increase of 36.2%. Adjusted operating margin was 21.0%.(*)

Net income from continuing operations was $10.1 million, or $0.57 per diluted share, compared to $1.4 million, or $0.10 per diluted share, for the same period last year. Excluding the effect of the non-cash gain on change in fair value of derivative liabilities of $0.9 million and the non-cash charge related to stock-based compensation of $0.7 million, the Company's adjusted net income from continuing operations was $9.9 million, or $0.55 per diluted share, compared to $7.6 million, or $0.53 per diluted share, in the first half of 2009.(*)

 (*) See table at the end of this press release for a reconciliation of operating income, net income and EPS to exclude the non-cash gain on change in fair value of derivative liabilities and the non-cash charge related to stock-based compensation.

Financial Condition

35

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Cash and cash equivalents were $43.6 million as of June 30, 2010. Current assets and current liabilities as of June 30, 2010, were $86.2 million and $10.8 million, respectively, yielding working capital of $75.4 million. The Company has no long-term debt. For the six months ended June 30, 2010, net cash provided by operating activities was $4.5 million.

Recent Developments

-- In July 2010, the Company announced a partnership with Agoda, a subsidiary of Priceline.com, to strengthen its hotel reservation business segment and upgrade its website, http://www.cnutg.com. Under the agreement, Universal Travel Group will offer its customers access to Agoda's international network of hotels. Through the updated cnutg.com website, travelers will be able to enjoy special Agoda promotions and instant confirmation at tens of thousands of hotels worldwide.

-- In June 2010, the Company acquired Shanxi Jinyang Travel and Kunming Business Travel for $8.0 million, of which 90% was paid in cash and 10% in stock.

-- In June 2010, the Company closed a common stock offering and issued 2,857,143 shares of its common stock at $7.00 per share for an aggregate amount of $20 million. The proceeds from this financing were used to fund the cash portion of the Company's two recently closed acquisitions and are expected to be used to fund the cash portion of the two acquisitions that have been announced but have not yet closed (Tianjin Hongxun Aviation Agency Co., Ltd. and Shandong Century Aviation Development Co., Ltd.) as well as for working capital to expand the Company's core business segments.

Business Outlook

Ms. Jiang commented, "In June, a number of Chinese airlines reported that they were authorized to cut the commission paid to travel agencies. Currently there has been no major impact on our existing business since the airlines planned to cut only the commission rates for a few flights departing from Beijing and Shanghai. Based on our analysis of air ticket booking habits in China, we believe that in the coming years the airlines will continue to heavily rely on travel agencies and pay travel agency commissions when selling tickets. Furthermore, we believe that any eventual commission rate cuts will serve to accelerate the consolidation of the travel services industry in China. We expect Universal Travel Group to be a beneficiary of any such consolidation as we believe the larger and more efficient travel service providers will gain more market share and the smaller and weaker players would be hurt most from any further commission rate cuts.

"As part of our strategy to position ourselves as a leader in the fast growing and consolidating China travel market, we closed two acquisitions of travel service providers in the second quarter, which together with our three acquisitions in the

36

first quarter, further expanded our geographic reach. We believe our comprehensive travel service platform and broad customer reach will enable us to improve the sales volume and operating efficiency of these new acquisitions. We also expect these newly acquired businesses to help our existing business by broadening the travel services we offer our customers. With a higher volume of bookings from our acquired businesses, our bargaining power with airlines and hotels should also benefit. Overall, we expect improved sales, margins and earnings as we fully integrate these businesses into our platform.

"Finally, we are very excited about our recently announced partnership with Agoda, a subsidiary of Priceline.com. Under the partnership agreement, we offer our customers access to Agoda's international network of hotels. Through our website, travelers will be able to enjoy special Agoda promotions and instant confirmation at tens of thousands of hotels worldwide. Also through this partnership, Agoda intends to increase its exposure in the large Chinese travel market. This partnership offers us the opportunity to work with one of the world's largest online hotel reservation agencies and further strengthen our hotel reservation segment. We intend to leverage Agoda's global brand awareness and look forward to a higher volume of hotel reservations."

As previously announced, for full year 2010, the Company expects to achieve between $145.0 million and $155.0 million in revenue, $27.0 million and $28.0 million in net income, and $1.35 and $1.40 in diluted EPS, excluding the effect of non-cash charges related to the change in fair value of derivative liabilities and stock-based compensation and assuming no further dilutive effect from financings or acquisitions.

56.    On August 17, 2010, the Company filed a Form 8-K with the SEC in which it announced that Individual Defendant Zhang had resigned as CFO the previous day "on the first anniversary of his employment and the expiration of his employment agreement with the company for personal reasons."   Zhang's resignation was not attributed to "any known disagreement with the company on any matter."

57.    The Form 8-K also announced that 28 year old Director Defendant Xie, who was already the Company's Secretary, was appointed by the Board "to be the company's interim Chief Financial Officer effective from that date until a suitable candidate has been qualified and selected." Director Defendant Xie received no increase in salary for his new duties, which were set in his February 13, 2009, employment agreement at "(i) an annual salary of $30,000, (ii) eligibility to receive bonus compensation and stock options or other equity-based incentives as

37

the discretion of the compensation committee of the Board of Directors, and (iii) medical and dental insurance, (iv) social insurance."[1]

58.   On August 19, 2010, and September 3, 2010, the Company filed Preliminary Proxy Statements with the SEC in advance of its annual shareholder meeting.   The Definitive Proxy Statement was filed with the SEC on September 13, 2010, and set the date and place of the annual meeting for October 11, 2010, in Shenzhen, Guangdong Province, PRC.

59.   Among other things, the purpose of the Proxy Statements was to solicit shareholder votes for the election of seven directors—Individual Defendants Jiang, Xie, Gao, Yuan, Liz. Wang, An, and Lee—and for ratification and approval of the 2010 Stock Incentive Plan ("SIP"), under which "directors, officers, employees or consultants to the Company" would be eligible for additional compensation.

60.   According to the Company's Form 10-K for 2010, *see infra*, the 2010 SIP was adopted in December 2010.   On December 2, 2010, UTG issued options to purchase 50,000 shares of common stock to Individual Defendant Jiang at an exercise price of $6.67.   It "also issued options to purchase an additional 950,000 shares of common stock on the same date to various employees and directors at an exercise price of $6.06.   The term of each option is for 10 years.   The options vest in two equal installments, the first being on the date of grant and the second on the first anniversary of grant."

61.   On September 1, 2010, the Company filed a Form 8-K with the SEC in which it announce that it "dismissed" its "current independent registered public accounting firm, Acqavella, Chiarelli, Shuster, Berkower & Co., LLP ('ACSB')" that day and replaced it with "Goldman Kurland Mohidin ('GKM')."   The Company stated in the filing:

---

[1] UTG's amended annual Proxy Statement filed with the SEC on September 13, 2010, stated that Xie earned $15,844 in total compensation in fiscal year 2009.   The reason for this discrepancy is unknown.

The reports of ACSB on our financial statements for each of the past two fiscal years contained no adverse opinion or a disclaimer of opinion and were not qualified or modified as to uncertainty, audit scope, or accounting principles. The decision to continue with GKM as our independent accountants was approved by the Audit Committee of our Board of Directors on September 1, 2010.

During our two most recent fiscal years and through the date of this Current Report on Form 8-K ("Report"), we have had no disagreements with ACSB on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure, which disagreements, if not resolved to the satisfaction of ACSB, would have caused it to make reference to the subject matter of such disagreements in its report on our financial statements for such periods.

During our two most recent fiscal years and through the date of this Report, there have been no reportable events as defined under Item 304(a)(1)(v) of Regulation S-K adopted by the Securities and Exchange Commission (the "SEC").

We provided ACSB with a copy of this disclosure before its filing with the SEC. We requested that ACSB provide us with a letter addressed to the SEC stating whether or not it agrees with the above statements, and we received a letter from ACSB stating that it agrees with the above statements.

62.     UTG's relationship with GKM was short-lived.   On October 5, 2010, the Company filed a Form 8-K with the SEC in which it announced:

On September 29, 2010, we received a letter dated September 28, 2010 from our current independent registered public accounting firm, Goldman Kurland Mohidin, LLP ("GKM"), informing us that they had resigned as our independent registered public accounting firm effective with the commencement of business on September 27, 2010. No reason was given as to the cause for their resignation.

GKM was only recently appointed as our independent registered public accounting firm on September 1, 2010, and had not yet commenced providing any accounting services to us. Accordingly, GKM had not provided any opinions, qualification or modification to our financial statements for each of the past two fiscal years nor do we have any disagreements with GKM on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure, which disagreements, if not resolved to the satisfaction of GKM, would have caused it to make reference to the subject matter of such disagreements in its report on our financial statements for such periods.

During our two most recent fiscal years and through the date of this Report, there have been no reportable events as defined under Item 304(a)(1)(v) of Regulation S-K adopted by the Securities and Exchange Commission (the "SEC").

39

We provided GKM with a copy of this disclosure before its filing with the SEC. We requested that GKM provide us with a letter addressed to the SEC stating whether or not it agrees with the above statements, and we received a letter from GKM stating that it agrees with the above statements.

63.     The Form 8-K also disclosed that the Audit Committee had engaged a new independent accounting firm, Windes & McClaughry Accountancy Corporation ("Windes"), effective September 30, 2010.   This meant the Company had three different independent accounting firms in a 30 day period (September 1-September 30).

64.     On September 10, 2010, the Company filed a Form 8-K with the SEC in which it announced it had sold all of its TRIPEASY kiosks on September 9, 2010, to Shenzhen Xunbao E-Commerce Co., Ltd. ("Shenzhen Xunbao"), an online insurance company, for approximately $5.93 million.   The 8-K stated that UTG "will continue to have exclusive air ticketing, hotel reservation and package tour travel product sales rights in all *TRIPEASY* kiosks for a two-year period from the closing date of the agreement."   The Form 8-K included as an exhibit a press release issued by the Company in which Individual Defendant Jiang stated "[w] e believe this sale will allow us to better focus on our core operations of delivering high quality travel products to our customers throughout China without having to incur the ongoing installation and servicing costs of maintaining over 1,500 TRIPEASY Kiosks.   We do not expect this transaction to reduce our top-line, at least for the next two years, as we have secured exclusive air ticketing, hotel reservation and package tour travel product sales rights via the kiosk network.   Our travel product offerings are complementary to Shenzhen Xunbao's travel insurance products and, as a result, we expect to negotiate a mutually beneficial arrangement to continue to utilize the TRIPEASY Kiosks as one of our multiple sales channels after the initial two-year period expires.   In terms of cost savings, we expect an increase in our gross margin as a result of eliminating costs associated with the kiosks."

65.     The Company failed to mention in the Form 8-K and in the press release that

40

Shenzhen Xunbao was under no obligation to offer "air ticketing, hotel reservation and package tour travel product[s]" through its newly-acquired kiosks. In addition, the sale of the kiosks rendering rendered the Company's prior projections about their economic performance meaningless.

66.     The Company was also in turmoil during this period because of an external source. On September 15, 2010, Bronte Capital published a devastating blog on the Company's financial reporting and operations. John Hempton, *Travelling through China with the Universal Travel Group: fly from Beijing to Yichang – pick up your tickets at Shenzen airport!*, Bronte Capital, (Sept. 15, 2010)   http://brontecapital.blogspot.com/2010/09/travelling-through-china-with-universal.html.   The author warned potential investors to avoid UTG stock because of, among other things, questionable accounting practices, an unwieldy web site, and poor customer service. He also questioned the credentials of GKM.

67.     UTG's shares, which closed at $4.77 per share on September 14, 2010, plunged $0.91 to close at $3.86 on September 15, 2010. Later that day, UTG issued a press release in which it "responded to allegations that appeared in the online blog by Bronte Capital. Universal Travel categorically denies all the allegations contained in the blog. The Company is consulting with its legal counsel as to the legal options available to it and will be aggressively pursuing all legal remedies against Bronte Capital and John Hempton for the damages caused to the Company and its shareholders." The press release also was included as an exhibit to a Form 8-K the Company filed with the SEC on September 15, 2010. No such legal action was ever taken.

68.     UTG's Form 10-Q for 3Q10 was filed with the SEC on November 15, 2010. It was signed by Individual Defendants Jiang and Xie, who also executed SOX Certifications substantially similar to those accompanying the Form 10-K. It contained the financial results

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   discussed in the press release issued by the Company the following day.

2       69.    On November 16, 2010, the Company issued a press release entitled "Universal

3   Travel Group Announces Third Quarter 2010 Results."  The press release stated in relevant part:

4
        SHENZHEN, China, Nov. 16, 2010 /PRNewswire-Asia-FirstCall/ -- Universal
5       Travel Group (NYSE: UTA) ("Universal Travel Group" or the "Company"), a
        leading travel services provider in China offering package tours, air ticketing,
6       and hotel reservation services online and via customer service representatives,
7       today announced financial results for the three and nine months ended September
        30, 2010.
8
        **Third Quarter 2010 Highlights**
9
10          •       Revenue increased 55.4% year-over-year to $46.3 million
            •       Excluding contribution of newly acquired businesses, revenue
11                  increased 16.6% year-over-year to $34.7 million
            •       Gross profit increased 37.4% year-over-year to $13.5 million
12          •       Gross margin was 29.1%, compared to 32.9% in the prior year
                    period and improved from 28.7% in the prior quarter period
13          •       Income from operations increased 27.8% to $9.5 million
14          •       Net income from continuing operations was $7.3 million or $0.36
                            per diluted share, compared to $4.7 million or $0.31 per
15  diluted                         share in the prior year period, a year over year
    increase of 55.3%
16
        "We are pleased with our third quarter results," said Ms. Jiangping Jiang,
17      Chairwoman and Chief Executive Officer. "Our packaged tour segment
18      continued to grow and remains our largest business segment as a result of our
        five recent acquisitions and the efficacy of our various marketing programs.  Our
19      air ticketing revenues benefited from increased sales volume as we sold
        approximately 250,000 more tickets in the third quarter of 2010 compared to
20      same period last year.  Our hotel business was flat year-over-year due to the
21      temporary disruption in the supply of hotel room inventory available for advance
        purchase from the Shanghai World Expo.  We expect the growth of our hotel
22      business to resume when market conditions return to normal."

23      **Third Quarter 2010 Financial Results**

24
        Revenue for the three months ended September 30, 2010, was $46.3 million
25      compared to $29.8 million for the same period in 2009, an increase of 55.4%.  In
        March 2010, the Company completed the acquisitions of Huangshan Holiday
26      Travel Service Co., Ltd., Hebei Tianyuan International Travel Agency Co., Ltd.,
        and Zhengzhou Yulongkang Travel Agency Co., Ltd.  In June 2010, the
27      Company completed the acquisitions of Shanxi Jinyang Travel Agency Co., Ltd.
28      and Kunming Business Travel Agency Co., Ltd.  The revenue contribution from
        these five newly acquired businesses in the third quarter of 2010 was $11.6

                                    42

million or 25.0% of the Company's total revenues for the quarter. Excluding the contribution of these newly acquired businesses, revenue for the third quarter of 2010 was $34.7 million, an increase of 16.6% from $29.8 million in the same period last year.

Revenue from air-ticketing was $6.7 million, compared to $4.9 million for the same period last year, an increase of 37.4%. This increase was mainly driven by the increase in air-ticket sales volume and growth from our Chongqing Travel World E-Business Co., Ltd. subsidiary.

Revenue generated by the Company's hotel reservation segment was $3.8 million, unchanged from the same period in 2009. The stagnant growth in this segment was due to the low available hotel inventory during the Shanghai World Expo, as the Company decided not to take the risk of purchasing hotel inventory in advance. Sales from the hotel reservation segment are expected to resume its normal growth after this one-time event.

Revenue generated by the Company's packaged tour segment was $35.8 million compared to $21.1 million for the same period in 2009, an increase of 69.7% from the same period last year. This increase was a result of the growth of the Chinese economy, increased sales from our Shenzhen Universal Travel Agency Co., Ltd subsidiary, and efforts in carrying out various marketing programs in this segment.

Gross profit was $13.5 million compared to $9.8 million for the same period last year, an increase of 37.4%. Gross profit margin was 29.1% compared to 32.9% for the same period last year, and 28.7% from the prior quarter in 2010. The decrease in gross profit margin was due to the increasing sales from the packaged tour business as a result of five new acquisitions of packaged tour companies, which have a lower profit margin due to the way revenues are recognized.

Selling, general and administrative ("SG&A") expenses totaled $4.0 million compared to $2.4 million for the same period last year, an increase of 70.3%. The SG&A expenses were 8.7% of revenue compared to 7.9% for the same period last year. The increase in SG&A expenses is in connection with the growth in business operations during the three months ended September 30, 2010, as compared to the same period of last year.

Income from operations was $9.5 million compared to $7.4 million in the same period last year, an increase of 27.8%.

Net income from continuing operations was $7.3 million, or $0.36 per diluted share, compared to $4.7 million, or $0.31 per diluted share, for the same period last year.

**Nine Months Results**

Revenue for the nine months ended September 30, 2010, was $109.2 million

43

compared to $63.7 million for the same period in 2009, an increase of 71.4%. The revenue contribution from the Company's five newly acquired businesses in the first nine months of 2010 was $28.5 million, or 26.1% of the Company's total revenues. Excluding the contribution of these newly acquired businesses, revenue for the first nine months of 2010 was $80.7 million, an increase of 26.7% from $63.7 million in the same period last year.

Revenue from air-ticketing segment was $17.1 million, compared to $10.9 million for the same period last year, an increase of 57.0%. Revenue generated by the Company's hotel reservation segment was $10.0 million compared to $9.1 million for the same period in 2009, an increase of 10.4%. Revenue generated by package tours was $82.0 million compared to $43.7 million for the same period in 2009, an increase of 87.6% from the same period last year.

Gross profit was $32.5 million compared to $21.8 million for the same period last year, an increase of 49.0%. Gross profit margin was 29.8% compared to 34.3% for the same period last year.

Selling, general and administrative ("SG&A") expenses totaled $10.6 million compared to $5.2 million for the same period last year, an increase of 103.7%. The SG&A expenses were 9.7% of revenue compared to 8.1% for the same period last year.

Income from operations was $22.0 million compared to $16.6 million in the same period last year, an increase of 32.4%.

Net income from continuing operations was $17.4 million, or $0.93 per diluted share, compared to $5.5 million, or $0.37 per diluted share, for the same period last year. Excluding the effect of the non-cash gain on change in fair value of derivative liabilities of $1.3 million, the non-cash charge related to stock-based compensation of $1.0 million and the $0.07 million one-time, non-cash gain on disposal of fixed assets, the Company's adjusted net income from continuing operations was $17.1 million, or $0.91 per diluted share, compared to $12.9 million, or $0.86 per diluted share, in the first nine months of 2009, a year-over-year growth of 34.9%. *

> * See table at the end of this press release for a reconciliation of operating income, net income and EPS to exclude the non-cash gain on change in fair value of derivative liabilities, non-cash charges related to stock-based compensation and the one-time, non-cash gain related to the disposal of fixed assets.

**Financial Condition**

Cash and cash equivalents were $56.7 million as of September 30, 2010. Current assets and current liabilities as of September 30, 2010, were $101.6 million and $12.0 million, respectively, yielding working capital of $89.7 million. The Company has no long-term debt. For the nine months ended September 30,

2010, net cash provided by operating activities was $17.1 million.

**Business Outlook**

Ms. Jiang commented, "We continue to focus on improving our sales and profitability by encouraging cross selling across our three businesses and implementing operating efficiencies as we move forward with the integration process for our newly acquired businesses. We remain optimistic about our business prospects given the strength of the travel market in China, our expanded geographic reach, and the comprehensive travel platform we offer our customers."

As previously announced, for full year 2010, the Company expects to achieve between $145.0 million and $155.0 million in revenue, $27.0 million and $28.0 million in net income, and $1.35 and $1.40 in diluted EPS, excluding the effect of non-cash charges related to the change in fair value of derivative liabilities and stock-based compensation and assuming no further dilutive effect from financings or acquisitions.

70.     On March 8, 2011, a report was published on UTG by Glaucus Research Group ("GRC"). GRC's report concluded:

- UTA is fabricating its publicly filed financial statements. Its actual underlying business is far smaller than its SEC filings indicate.

- UTA's business model is not credible. For example, UTA claims to have earned $110 million in net revenue in the first three quarters of 2010 on an advertising budget of $247,449 in the highly competitive leisure travel market. Its competitors spend five to 10 times more on marketing as a percentage of net revenue, casting doubt on the authenticity of UTA's revenue and net income.

- UTA has a deficient and unpopular website, boasts only a minimal brick-and-mortar retail operation and has no kiosks under its control to directly sell to consumers. Yet the company's return on assets and asset turnover figures suggest it is the most efficient company in the leisure travel space, consistently trouncing the competition.

- UTA's website is barely functional . . . offers a terrible user experience and receives only a small fraction of the traffic of its Chinese competitors,   despite the fact that the company holds itself out as an online travel  service provider.

- UTA is a serial capital raiser, repeatedly returning to western investors for cash despite supposedly having, according to its balance sheet, ample cash on hand, which sits unused in an account earning .36% in interest per     year. UTA is lying about the amount of cash on its balance sheet, as is evidenced by its inexplicably low interest income.

45

- UTA has destroyed shareholder value through a series of dilutive acquisitions. The company's acquisition targets had much smaller earnings than UTA claimed in its public filings.

- UTA's purported relationship with Agoda, a subsidiary of Priceline.com, is overstated.

- UTA has burned through 4 low-quality auditors and 3 CFOs in 5 years.

http://www.glaucusresearch.com/GlaucusResearch-Universal_Travel-Group-UTA-Strong_Sell-March_8_2011.pdf.

71.    The report began with the following devastating summary:

In this report, *we present compelling evidence that Universal Travel Group* ("UTA" or the "company") *is falsifying its publicly filed financial statements.* We believe that UTA's SEC financial statements greatly exaggerate the company's revenue, cash balance and net income. UTA is actually a tiny and antiquated brick-and-mortar travel business, and *its management is lying about the size and sophistication of the business in order to misappropriate funds from investors*.

(Emphasis added).  The report found that:

- UTA has a miniscule marketing budget to attract and retain customers.

- UTA's website is barely functional and unpopular.

- UTA has a limited number of, if any, brick-and-mortar retail outlets.

- UTA has no kiosks under its control through which the Company can sell airline tickets, hotel room or package tours. In 2008, UTA made a big deal about its plan to deploy kiosks across China in order to market and sell its travel products directly to consumers. UTA's 10-K for the fiscal year 2009 mentions the word "kiosk" 35 times and its 10-k for the fiscal year 2008 mentions the word 28 times. Then, on September 10, 2010, UTA **sold all of its kiosks** to an insurance product retailer which has no contractual obligation to permit UTA to use the kiosks to market and sell its products to consumers.

This begs the question: how does UTA attract customers? **With a moribund internet presence, a tiny brick-and-mortar retail operation and no direct-to-consumer kiosk business under its control, we would expect a large advertising budget to attract customers to its call center. UTA's SEC filings show exactly the opposite.**

46

(Emphasis added).

72.     The report pillaged UTG's marketing budget and operations, financials, and web site. It maintained that UTG could not possibly have the revenues and earnings it claimed based upon its paltry advertising budget. It was particularly critical of UTG's acquistions, finding that the Company "paid between 134x to 4228x net income during its acquisition rampage. Across the board, [its] target companies earned far less at the time of acquisition than [the Company] claimed in its public filings." The report concluded that UTG paid too much for its acquisitions, wasting shareholder assets. It also questioned why the Company issued additional stock in June 2010, ostensibly to raise about $19 million in cash for its acquisitions but diluting shareholder value, when it was supposedly sitting on almost $39 million in cash that was earning a mere .36% interest per annum. Its suspicion was that "UTA has been lying about its cash balance."

73.     The Company's auditors were not spared. The report found that UTG's original independent auditor, Moore and Moore & Associates, Chartered ("MMA") which was in place from the time of the Company's formation until June 23, 2006, had been charged by the SEC with "with securities fraud for issuing false audit reports and compiling audit reports with auditors who did not even have college degrees." Its second auditor, MSB, had been reprimanded by the Public Company Accounting Oversight Board ("PCAOB") "for inadequate quality controls with respect to fraud." The third auditor, ACSB, was fired after less than one year, and the fourth auditor, GKM, resigned after less than a month on the job.

74.     Unlike the case of the September 2010 Bronte Capital blog, the Company did not immediately respond with a press release and an SEC filing threatening legal action. Instead, it chose to answer with silence.

75.     Shares of UTG, which closed at $6.18 per share on March 8, 2011, dropped $0.47 to close at $5.71 per share on March 9, 2011. By March 21, 2011, UTG shares closed at

47

$4.90 per share.

76.     On March 14, 2011, UTG issued a press release in which it announced it would "host a conference call to discuss the Company's financial results for the fourth quarter 2010 on Wednesday, March 30, 2011." The press release promised that Individual Defendants Jiang and Xie would discuss the results and take questions.

77.     On March 29, 2011, after the market closed, UTG issued a press release entitled "Universal Travel Group Postpones Earnings Conference Call From March 30 to Later in 2011." It stated:

> SHENZHEN, China, March 29, 2011 /PRNewswire-Asia/ -- Universal Travel Group ("Universal Travel Group" or the "Company") (NYSE: UTA), a leading travel services provider in China, offering package tours, air ticketing, and hotel reservation services online and via customer service representatives, today announced that it has postponed its year 2010 earnings conference call previously scheduled for March 30, 2011 at 09:00 a.m. EDT to a later day in 2011 to be determined. The postponement was not due to any accounting irregularities and will allow the Company and its independent auditors to complete their work on the financial statements and audit. The Company regrets any inconvenience that the postponement may have created.

78.     The March 29 announcement rocked the market. UTG shares, which had closed at $5.39 per share on March 29, 2011, dropped $1.06 to close at $4.33 on March 30, 2011.

79.     On March 31, 2011, the Company filed Form 12b-25 with the SEC, providing notice that its Form 10-K for fiscal year 2010 would not be timely filed.

80.     On April 12, 2011, trading in the Company's stock on the NYSE was halted without explanation.

81.     On April 14, 2011, the Company issued a press release that contained more bad news about its auditors. The press release, entitled "Universal Travel Group Inc. Appoints EFP Rotenberg & Co, LLP as Independent Auditors, Subject to Clearing Client Acceptance Procedures," stated:

> SHENZHEN, China, April 14, 2011 /PRNewswire-Asia-FirstCall/ -- Universal

48

Travel Group Inc. ("Universal Travel Group" or the "Company") (NYSE: UTA), a leading travel services provider in China, offering package tours, air ticketing, and hotel reservation services online and via customer service representatives, today announced it has engaged EFP Rotenberg & Co, LLP as its independent registered public accounting firm with immediate effect to take over from Windes & McClaughry Accountancy Corporation ("Windes") subject to the Company clearing Rotenberg's client acceptance procedures.

On April 10, 2011, the Company received notification that its principal independent accountants, Windes, had resigned its engagement with the Company effective April 9, 2011. Windes was engaged by the Company on September 30, 2010. Windes' resignation as the Company's principal independent accountant was accepted by the Audit Committee on April 11, 2011.

***Windes had informed the Company in its resignation letter that it was no longer able to complete the audit process. Windes stated this was due in part to the Company's management and/or the Audit Committee being non-responsive, unwilling or reluctant to proceed in good faith and imposing scope limitations on Windes' audit procedures.***

***Windes also stated that it had lost confidence in the Board of Director's and the Audit Committee's commitment to sound corporate governance and reliable financial reporting.***

***Prior to its resignation, Windes raised the following issues, some of which may be considered to be disagreements, encountered during the audit, including issues related to the authenticity of confirmations, a loss of confidence in confirmation procedures carried out under circumstances which Windes believed to be suspicious; issues concerning the lack of evidence of certain tour package contracts and related cash payments.***

As a result, Windes had requested authority to perform additional audit procedures and the above issues to be addressed by an independent Audit Committee investigation. Windes stated in its resignation letter that, in its view, the Company was not willing to proceed in good faith with the course of action requested by Windes. Windes also stated in its resignation letter that in its opinion, it believed that certain statements made by Management and the Audit Committee, between March 29, 2011 and its resignation letter, impaired its independence as it related to the Company.

Universal Travel Group disagrees with Windes' reasons for resignation, in particular, the Company and/or the Audit Committee's purported unwillingness or reluctance and/or non-responsiveness to proceed in good faith and imposition of scope limitations on Windes' audit procedures, the Company's purported unwillingness to proceed in good faith with courses of action requested by Windes and the Company's management and the Audit Committee's purported impairment of Windes' independence in relation to the Company a result of certain statement made by them.

1

2      Universal Travel Group believes that it has acted responsively, prudently and in
       good faith to address the numerous issues raised by Windes during the entire
3      audit process. Windes disagrees. The Company's management, the Audit
       Committee and Windes attempted to resolve these disagreements to no avail.
4
       The Company has authorized Windes to respond fully to the inquiries of its
5      successor accountant regarding the subject matter of each of such disagreements.

6
       Windes has not provided any opinions, qualification or modification to the
7      Company's financial statements for each of the past two fiscal years. The
       Company does not have, as otherwise disclosed above, any other disagreements
8      or reportable events as described under Item 304(a)(1) of Regulations S-K.

9      **New Independent Accountants**

10
       The Company's Audit Committee approved the appointment of EFP Rotenberg
11     & Co., LLP as its new independent registered public accounting firm effective as
       of April 12, 2011 and Rotenberg has agreed, subject to the Company clearing
12     their client acceptance procedures, to act as the Company's new independent
       registered public accounting firm. During the two most recent fiscal years and
13     through the date of the engagement, the Company did not consult with Rotenberg
14     regarding either (1) the application of accounting principles to a specified
       transaction, either completed or proposed, or the type of audit opinion that might
15     be rendered on its financial statements, or (2) any matter that was either the
       subject of a disagreement (as defined in Regulation S-K Item 304(a)(1)(v)).
16
17     Prior to engaging Rotenberg, Rotenberg did not provide the Company with either
       written or oral advice that was an important factor considered by the Company in
18     reaching a decision to continue the appointment of Rotenberg as its new
       independent registered public accounting firm.
19
       As a result of Windes resignation, the Company will not be able to file the
20     Annual Report on Form 10-K by April 15, 2011. Management is committed to
21     work with Rotenberg to complete the audit for fiscal year 2010 as soon as
       practicable and will file a Current Report on Form 8-K to announce when the
22     annual report for fiscal year 2010 will be filed once timing is ascertained.

23   (Emphasis added).

24         82.    The same day, the Company filed Form 8-K with the SEC containing a
25
     substantially similar statement.  Included as an exhibit was a letter from Windes to the SEC
26
27   dated April 14, 2011, in which Windes disagreed with the Company's statement that "[a]s a
28   result of Windes resignation, the Company will not be able to file the Annual Report on Form

                                             50
     VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

10-K by April 15, 2011." The letter said that "Windes['] resignation did not impact or affect whether the Company would have been able to file on or by April 15, 2011. Irrespective of our resignation, the Company would not have been able to file such an annual report on Form 10-K on or by April 15, 2011 *as Management and the Audit committee were unwilling to cooperate and help facilitate the audit processes incidental to completion of the audit*. As a direct result of the same, Windes would not have been in a position to complete the audit and therefore the Company would not have been able to file on or by April 15, 2011." Windes added that "*recent statements made and/or positions taken by the Audit Committee and/or Management, appeared to impair our independence thereby prohibiting us from rendering an opinion on the December 31, 2010 consolidated financial statements*." (Emphasis added).

83.    Windes' resignation confirmed the allegations by Bronte Capital and GRC that the Company's financial results were not accurate. Moreover, its statement that it lacked "confidence in confirmation procedures carried out under circumstances which [it] believed to be suspicious" and that it had "issues concerning the lack of evidence of certain tour package contracts and related cash payments" strongly implied fraudulent activity at the highest levels of the Company. "Confirmation is an audit process by which an auditor obtains and evaluates a direct communication from a knowledgeable third party in response to a request for information regarding account balances, transactions or other items that comprise a company's financial statements." PCAOB Release No. 2009-002, CONCEPT RELEASE ON POSSIBLE REVISIONS TO THE PCAOB'S STANDARD ON AUDIT CONFIRMATIONS, 2 (Apr. 14, 2009).

84.    On May 16, 2011, the Company filed a Form 12b-25 with the SEC in which it advised that its Form 10-Q for the first quarter of 2011 would not be timely filed.

85.    On June 8, 2011, the Company filed with the SEC its Form 10-K annual report

51

for the year ending December 31, 2010.  The 10-K reported that the Company's revenues were $153,318,946, up 60.04% from 2009.  Only $31,806,319, or 20.75% of the Company's total revenues for the fiscal year, was attributed to the acquisition of the five subsidiaries during 2010.  Incredibly, its net income was $22,039,394, an increase of 105.11% from 2009.  The Company stated this spectacular gain was "mostly due to our efforts to expand our business, our merger and acquisition strategy, as well as the non-cash gain on change in fair value of derivative liability and the effect of the discontinued operation," *i.e.*, Shenzhen Speedy Dragon Enterprise Limited, in 2009.  However, the reliability of these results is questionable in that UTG reported "Selling, general and administrative expenses" of only $11,790,250 on its revenues of over $153 million, a percentage that is disproportionately far below that of similar companies.  The Company conceded in the 10-K that "[s]ales and marketing for the past two years account for [a] very small percentage of our revenue."  Moreover, the Company was sitting on cash and cash equivalents of $39,618,988 as of December 31, 2010, but failed to declare a dividend, indicating the Individual Defendants either were lying about the amount of cash on hand or were using the Company as a personal ATM.

86.     On June 10, 2011, just two days later, the Company filed a Form 8-K with the SEC in which it stated that its "financial statements for the three, six and nine months ended March 31, 2010, June 30, 2010 and September 30, 2010," which were included in its Form 10-Qs for 1Q10, 2Q10, and 3Q10, "did not properly account for the following item in accordance with [U.S. GAAP], and, as a result, cannot be relied upon:  1. An inconsistency between the acquisition dates of the Company's five new subsidiaries per the Company's 8-K filings and the reported periods of profit and loss statements included in the consolidated financial statements of the 10-Qs."  Included as an exhibit was a letter from Rotenberg to the SEC dated June 9, 2011, which stated in relevant part "[w]e have read the Company's disclosure set forth in Item

52

4.02 Non-Reliance on Previously Issued Financial Statements or a Related Audit Report or Completed Interim Review of the Company's Form 8-K dated on or about June 9, 2011 (the "8-K") and we are in agreement with the disclosure in the 8-K, in so far as it pertains to our firm."

87.     The Company thus admitted material accounting deficiencies in 2010 with respect to its newly-acquired subsidiaries.

88.     At least one securities fraud lawsuits (the "Securities Fraud Actions") has been filed in federal district court.  *Snellink v. Universal Travel Group, Inc.*, Case No. 2:11-cv-02164-KSH-PS (D.N.J) (filed Apr. 15, 2011).  The case named the Company and Individual Defendants Jiang, Zhang, and Xie as defendants.  The complaint alleged numerous false and/or misleading statements of materials facts and/or failure to disclose material facts necessary to make the statements not misleading in violation of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (15 U.S.C. §§ 78j(b) and 78t(a)), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated pursuant to section 10(b).  In addition, another shareholder derivative action has been filed in the First Judicial District Court of the State of Nevada in and for Carson City.  *Loeb v. Jiang*, Case No. 11-0C001691B (filed May 20, 2011).  It alleges breach of fiduciary duty, waste of corporate assets, and unjust enrichment by the Individual Defendants.

## DERIVATIVE AND DEMAND ALLEGATIONS

89.     Plaintiff incorporates all preceding paragraphs as if set forth fully herein.

90.     Plaintiff brings this action derivatively in the right and for the benefit of UTG to redress the breaches of fiduciary duty and other violations of law by the Individual Defendants.

91.     Plaintiff will adequately and fairly represent the interests of UTG and its shareholders in enforcing and prosecuting its rights, and it has retained counsel experienced in litigating these types of actions.

92.     At the time this action was initiated, the Board was comprised of the following

53

seven Director Defendants:  Jiang, Xie, Gao, Liz. Wang, Yuan, Lee, and An.  Plaintiff has not made any demand on the Board to institute this action because such a demand would be a futile, wasteful and useless act, for the following reasons:

93.    Director Defendants Jiang, Xie, and Gao have clearly demonstrated their hostility and/or inability to act in compliance with their fiduciary obligations and/or to sue themselves and/or their fellow directors and allies in the top ranks of the Company for the violations of law complained of herein, as well as their hostility to the relief sought in this action. All three are "inside" directors who receive considerable remuneration for their work as Company Officers and thus lack disinterest for the purpose of considering a demand;

a.    Director Defendants Jiang (CEO), Xie (Interim CFO), and Gao (Vice President of Corporate Finance) have been directly and personally involved in the wrongdoing complained of herein, making them subject to a substantial likelihood of personal liability and thus unable to consider a demand with disinterest.  As stated in Windes' April 14, 2011, letter, "Management . . . [was] unwilling to cooperate and help facilitate the audit processes incidental to completion of the audit" and "recent statements made and/or positions taken by . . . Management, appeared to impair our independence thereby prohibiting us from rendering an opinion on the December 31, 2010 consolidated financial statements;

b.    Director Defendants Jiang and Xie are defendants in the Securities Fraud Actions.  Any decision to pursue the instant litigation substantially increases their potential for liability in those cases, making them unable to consider a demand with disinterest, especially in light of the substantial likelihood that they knowingly submitted false SEC filings and SOX Certifications;

c.    Director Defendants Lee, Yuan, and Liz. Wang are members of the Audit Committee.  As stated in UTG's April 14, 2011, press release and in Windes' April 14 letter,

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Windes accused the Audit Committee of being non-responsive, unwilling or reluctant to proceed in good faith, and imposing scope limitations on Windes' audit procedures. The Windes letter stated that "the Audit committee [was] unwilling to cooperate and help facilitate the audit processes incidental to completion of the audit" and that "recent statements made and/or positions taken by the Audit Committee . . . appeared to impair our independence thereby prohibiting us from rendering an opinion on the December 31, 2010 consolidated financial statements." Such accusations by an independent auditor are highly unusual and, when considered in conjunction with all the other adverse information previously made available about the Company's financial statements, make clear that the members of the Audit Committee face a substantial likelihood of liability for, *at a minimum*, their conscious and willful utter failure to implement any reporting or information system or controls or, having implemented such a system or controls, their conscious and willful utter failure to monitor or oversee its operations, thus disabling them from being informed of risks or problems requiring their attention. *More likely*, the members of the Audit Committee were active participants in the material misrepresentations and omissions perpetrated on the Company and its shareholders. Accordingly, their personal potential liability for the acts alleged herein casts doubt about their ability to evaluate disinterestedly a demand on the Board. Thus, demand was not required upon Lee, Yuan, and Liz. Wang;

        d.    UTG's April 14, 2011, press release makes clear that the Board disagreed with independent auditor Windes' highly unusual assessment that: the Board is unwilling to proceed in good faith and has imposed of scope limitations on Windes' audit procedures; the Board is unwilling to proceed in good faith with courses of action requested by Windes; and the Company's management and the Audit Committee impaired Windes' independence in relation to the Company as a result of certain statements made by them. Moreover, this is the second

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1   time the Board has denounced a third party seeking to tell the truth about the Company, the first

2   being its angry but empty threat to sue Bronte Capital and John Hempton for the highly

3   unfavorable but truthful September 15, 2010, blog.  No reasonable UTG stockholder would

4   believe that a majority of the members of the Board are able to consider independently and

5   properly a demand in good faith under the circumstances and, accordingly, demand is excused

6   .

7           e.      Director Defendants Jiang, Xie, Gao, Liz. Wang, Yuan, Lee, a majority

8   of the Board, are interested in a demand because they engaged in conduct which is not protected

9   by the business judgment rule in connection with their decision to permit Individual Defendants

10  Zhang to "resign," when the Board had grounds to terminate him "for cause;"

11          f.      All of the Director Defendants face a significant likelihood of liability

12  for, *at a minimum*, their conscious and willful disregard of the fraudulent activities raised by

13  Windes and more likely their active involvement in such activities;

14

15          g.      Every member of the Board is required to comply with the Company's

16  Code of Ethics, including the Corporate Governance Guidelines.  The Code of Ethics requires

17  compliance with laws applicable to "false or misleading financial information," mandates that

18  every employee "be on guard for, and promptly report, *any possibility* of inaccurate of

19  incomplete financial reporting," and orders that "[p]articular attention should be paid to

20  financial results that seem inconsistent with the performance of the underlying business."  "The

21  Company's senior financial officers . . . have a special responsibility to ensure that all of the

22  Company's financial disclosures are full, fair accurate, timely and understandable."  However,

23  the Code's guidance that "[a]n Employee with information relating to questionable accounting

24  or auditing matters may also confidentially, and anonymously if they desire, submit the

25  information in writing to the Board's Audit Committee" is meaningless in light of the Audit

26  Committee's complicity in the Company's financial reporting malfeasance.  The Corporate

27

28

Governance Guidelines state that "[t]he Board believes that it is imperative that timely and accurate disclosure in compliance with applicable laws, rules and regulations is made on all material matters, including: (i) the Company's financial condition; (ii) the Company's financial performance; [and] (iii) foreseeable risk factors for the Company . . . . The Company has a responsibility to furnish information that is honest, intelligible, meaningful, timely, and broadly disseminated." The rules for "Senior Executive and Financial Officers" also stressed the need for "full, fair, accurate, timely and understandable disclosure in our periodic reports filed with the SEC and in our other public communications," and required "exercise [of] the highest standard of care in preparing such materials." The Director Defendants, particularly Jiang, Xie, Gao, Liz. Wang, Yuan, and Lee, themselves consciously and willfully engaged in, and permitted others at the Company, including Individual Defendant Zhang, to engage in, the illicit conduct described above, thereby consciously and willfully abdicating their fiduciary duties to the Company in violation of the Code of Ethics and the Corporate Governance Guidelines and, in the case of Director Defendants Jiang, Xia, and Gao, the rules for Senior Executive and Financial Officers. Therefore, each faces a substantial likelihood of liability for their conscious and willful breaches of fiduciary duties and any demand upon them, a majority of the Board is futile;

h. During the Relevant Period, Director Defendants Liz. Wang, Yuan, and Lee served as members of the Audit Committee. Pursuant to the Audit Committee Charter, they were responsible for, *inter alia*, reviewing "the quality, adequacy and effectiveness of the Company's internal controls and any significant deficiencies or material weaknesses in the design or operation of internal controls" and reviewing the Company's annual and periodic financial statements and earnings press releases. Director defendants Liz. Wang, Yuan, and Lee consciously and willfully breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, *inter alia*, allowed or permitted false and misleading statements

57

to be disseminated in the Company's SEC filings and other disclosures and failed to ensure that adequate internal controls were in place.   Additionally, pursuant to the Company's Audit Committee Charter, the members of the Audit Committee consciously and willfully failed to exercise proper oversight over the Company independent auditors by either summarily dismissing them when they got too close to the truth (ACSB), or forcing them to resign by failing to cooperate and impeding their work (GKM, Windes).   Therefore, Director Defendants Liz. Wang, Yuan, and Lee face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

94.   Thus, for the reasons set forth above, *at least* a majority of the Director Defendants, if not all of the Director Defendants, cannot consider a demand with disinterest and independence, and demand upon the Board is excused as futile.

95.   The Company unquestionably will expend millions of dollars in internal investigations, restating its financial reports, and defending the Securities Fraud Actions.   It may be liable for hundreds of millions of dollars in damages if it loses or settles the Securities Fraud Actions.   In addition, the Company faces the prospect of governmental investigations and permanent delisting by the NYSE.   Furthermore, the Company's reputation has been severely damaged. The Company has also wasted a substantial amount of money in compensation and benefits paid to the Individual Defendants.   Its market capitalization has been severely diminished, and its ability to raise equity in the future has been all but destroyed.   All of this substantial damage stems proximately from the Individual Defendants' conscious and willful breaches of their fiduciary duties, gross mismanagement, abuse of control, and other malfeasance.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## COUNT I

## AGAINST ALL INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTY FOR DISSEMINATING FALSE AND MISLEADING INFORMATION

96.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

97.     As alleged in detail herein, each of the Individual Defendants had a duty to ensure that UTG disseminated accurate, truthful and complete information to its shareholders.

98.     Defendants violated their fiduciary duties of care, loyalty, and good faith by intentionally making, causing or allowing the Company to disseminate to its shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings, press releases, and other public statements and disclosures as detailed herein.  These actions could not have been a good faith exercise of prudent business judgment.

99.     As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

100.    Plaintiff, on behalf of UTG, has no adequate remedy at law.

## COUNT II

## AGAINST ALL INDIVIDUAL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO MAINTAIN INTERNAL CONTROLS

101.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

102.    As alleged herein, each of the Individual Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

59

103.    Defendants consciously and willfully ignored the obvious and pervasive problems with UTG's internal controls and practices and procedures and failed to make a good faith effort to correct these problems or prevent their recurrence.

104.    As a direct and proximate result of the Defendants' foregoing breaches of fiduciary duties, the Company has sustained damages.

105.    Plaintiff, on behalf of UTG, has no adequate remedy at law.

## COUNT III

### AGAINST ALL DEFENDANTS FOR BREACH OF FIDUCIARY DUTIES FOR FAILING TO PROPERLY OVERSEE AND MANAGE THE COMPANY

106.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

107.    The Individual Defendants owed and owe UTG fiduciary obligations.  By reason of their fiduciary relationships, Defendants specifically owed and owe UTG the highest obligation of good faith, fair dealing, loyalty and due care.

108.    The Individual Defendants, and each of them, consciously and willfully violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

109.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, UTG has sustained significant damages, not only monetarily, but also to its corporate image and goodwill.

110.    As a result of the misconduct alleged herein, Defendants are liable to the Company.

111.    Plaintiff, on behalf of UTG, has no adequate remedy at law.

60

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## COUNT IV

**AGAINST ALL INDIVIDUAL DEFENDANTS FOR UNJUST ENRICHMENT**

112.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

113.   By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of UTG.  Director Defendant Jiang, in particular, has earned enormous sums by and through her malfeasance and that of the other Individual Defendants.

114.   The Individual Defendants consciously and willfully committed, or allowed the commission of, the fraudulent acts alleged by Windes.

115.   Plaintiff, as a shareholder and representative of UTG, seeks restitution from the Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants, and each of them, as a result of their wrongful conduct and fiduciary breaches.

116.   Plaintiff, on behalf of UTG, has no adequate remedy at law.

## COUNT V

**AGAINST ALL INDIVIDUAL DEFENDANTS FOR ABUSE OF CONTROL**

117.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

118.   The Individual Defendants' conscious and willful misconduct alleged herein constituted an abuse of their ability to control and influence UTG, for which they are legally responsible.  In particular, they consciously and willfully abused their positions of authority by making material misrepresentations and/or causing or allowing UTG to misrepresent material facts regarding its financial position and business prospects.

61

119.    As a direct and proximate result of the Individual Defendants' abuse of control, UTG has sustained significant damages.

120.    As a result of the conscious and willful misconduct alleged herein, the Individual Defendants are liable to the Company.

121.    Plaintiff, on behalf of UTG, has no adequate remedy at law.

## COUNT VI

## AGAINST ALL INDIVIDUAL DEFENDANTS FOR GROSS MISMANAGEMENT

122.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

123.    The Individual Defendants had a duty to UTG and its shareholders to supervise, manage and control prudently the operations, business and internal financial accounting and disclosure controls of the Company.

124.    The Individual Defendants, by their actions and by engaging in the conscious and willful wrongdoing described herein, abandoned and abdicated their responsibilities and duties with regard to managing prudently the businesses of UTG in a manner consistent with the duties imposed upon them by law.  By committing the misconduct alleged herein, the Individual Defendants consciously and willfully breached their duties of due care, diligence and candor in the management and administration of UTG's affairs and in the use and preservation of UTG's assets.

125.    During the course of the discharge of their duties, the Individual Defendants knew of the unreasonable risks and losses associated with their misconduct, yet the Individual Defendants caused UTG to engage in the scheme complained of herein, thus breaching their duties to the Company.  As a result, the Individual Defendants grossly mismanaged UTG.

126.    Plaintiff, on behalf of UTG, has no adequate remedy at law.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## COUNT VII

### AGAINST ALL INDIVIDUAL DEFENDANTS FOR WASTE OF CORPORATE ASSETS

127.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

128.   As a result of the conscious and willful misconduct described above, and by consciously and willfully failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused UTG to incur (and UTG will continue to incur) significant legal liability and/or legal costs to defend itself as a result of the Individual Defendants' misconduct and unlawful actions.

129.   As a result of this conscious and willful waste of corporate assets, the Individual Defendants are liable to the Company.

130.   Plaintiff, on behalf of UTG, has no adequate remedy at law.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.   Against all Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' conscious and willful breaches of fiduciary duties and other wrongdoing;

B.   Directing UTG to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein.

C.   Awarding to UTG restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

63

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

D.     Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.     Granting such other and further relief as the Court deems just and proper.

### JURY TRIAL DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.

DATED: June 30, 2011                          Respectfully submitted,

**COOKSEY, TOOLEN, GAGE,
DUFFY & WOOG**

Griffith H. Hayes, Esq.
Nevada Bar No. 7374
Martin A. Muckleroy, Esq.
Nevada Bar No. 9632
3930 Howard Hughes Parkway, Suite 200
Las Vegas, Nevada 89169
Telephone:  (702) 949-3100
Facsimile:  (702) 949-3104

*Attorneys for Plaintiff*

OF COUNSEL:

Seth D. Rigrodsky
Brian D. Long
Marc A. Rigrodsky
**RIGRODSKY & LONG, P.A.**
919 North Market Street, Suite 980
Wilmington, Delaware 19801
Telephone: (302) 295-5310
Facsimile: (302) 654-7530

64

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## <u>VERIFICATION</u>

I, Shaorong Liao, hereby declare, under penalty of perjury as follows:

I am the plaintiff in the above-captioned shareholder derivative action.  I have read the foregoing shareholder derivative complaint (the "Complaint") and authorized its filing.  Based upon the investigation of my counsel, the allegations in the Complaint are true to the best of my knowledge, information and belief.


DATED: May 27, 2011

SHAORONG LIAO